UNITED STATES v. CHICAGO, B. & Q.
R. CO.
No. 5964.

Circuit Court of Appeals, Seventh Circuit.
April 12, 1937.

162

Harry W. Blair, Asst. Atty. Gen., John J. Boyle, U. S. Atty., of Madison, Wis., and D. B. Hempstead and A. C. Wiprud, Sp. Assts. to the Atty. Gen.

Andrew Lees, of La Crosse, Wis., and Andrew C. Scott and J. C. James, both of Chicago, Ill. (Bruce Scott, of Chicago, Ill., of counsel), for appellee.

Before SPARKS, Circuit Judge, and BRIGGLE and BALTZELL, District Judges.

SPARKS, Circuit Judge.

This is an appeal from a judgment of the District Court assessing damages in condemnation proceedings instituted by the Government with respect to the navigation project of the Mississippi River, authorized by an Act of Congress approved January 21, 1927, 44 Stat. 1010. Two actions at law are involved, and numerous questions are presented, which render necessary a rather full statement of the issues of both causes and the manner in which they were disposed of.

On September 19, 1931, the Government filed its action No. 3683, to condemn 2.9 acres of land in the city of Alma, Wisconsin. It was alleged that that land was a part of the site of Lock and Dam No. 4 as contemplated by the project, which was about to be begun. The action was brought against appellee and numerous other corporate bodies and natural persons, who, it was alleged, constituted, as nearly as the Government could ascertain, all persons claiming to be the owners or occupants of those lands, or claiming any right, title, equity or interest therein.

On August 9, 1932, the Government amended its original petition by reducing the amount of land sought to be condemned to 1.6 acres, and retained as defendants the appellee and several hundred others who, as alleged, were claiming some interest therein. The amended bill further stated that the proposed dam should have a crest elevation of 667 feet mean sea level, intended to provide a pool no higher than 667 feet, mean sea level at the dam.

On August 17, 1932, the court, over the Government's objections and exceptions, sustained appellee's motion to make the amended petition more specific, and ordered the same done by filing plans of the lock and dam to be built, or sufficient information as to the structural and engineering features thereof, to enable appellee to determine and make proof of the damage to the remainder of its property resulting from the construction, operation and maintenance of the lock and dam.

On December 3, 1932, the Government complied with this order by amending its amended petition, in which it was stated, among other matters, that the dam would be of a nonnavigable type with a controlled spillway section 1,355 feet long, having a crest elevation of 667 feet mean sea level datum; that the top of the lock and guide walls would be at elevation 672 feet mean sea level, and that the spillway would be so controlled as to maintain a pool elevation at 667 feet. The official map filed with the amendment disclosed the elevation of the pool along the upper side of the dam to be 667.

Following the hearing on the amended petition, an order was entered January 14, 1933, granting the condemnation of the property described in the amended petition, and appointing commissioners to fix the compensation for its taking. On January 25, 1933, the Government applied for immediate possession of the condemned 1.6 acres, alleging the value thereof to be not in excess of $500. On the same day the court granted the application conditioned on the deposit of $110,000 with the court, as security for the payment of such just compensation as might be finally awarded. This order was complied with without objection or exception on the part of the Government. On January 31, 1933, on the motion of appellee, and over objections and exceptions by the Government, the court amended its order granting condemnation and appointing commissioners by adding to that portion of the order directing the commissioners to ascertain, award and report the compensation for the property taken as described in the amended complaint, the following words, "together with all damages to the remainder of respondent's property resulting from the construction and operation of the lock and dam described in the petition herein."

Pursuant thereto, the commissioners made, and on June 7, 1933, filed, their award for the value and damages to be sustained by reason of the appropriation. They were made in varying amounts to eleven named respondents in the aggregate sum of $4,627, and to appellee for the taking of its interest in the 1.6 acres of land in the sum of $160, together with damages to its roadbed, track and bridge across Beef River from Alma to Trevino, in Buffalo County, Wisconsin, in the sum of $84,296. From all of these awards the Government appealed on June 29, 1933, to the District Court.

On October 16, 1933, the Government filed its petition in law, No. 3767, against appellee and other defendants, to condemn certain lands in fee (none of which was owned by appellee), and certain easements in lands to an elevation of 670 feet above mean sea level datum (1912 adjustment) for flowage in connection with Lock and Dam No. 4. Included in this easement sought to be appropriated was a flowage easement upon that portion of appellee's right of way within the area described in the petition which extends northwesterly, across what is known as Beef Slough, to a point about six miles above the 1.6 acre tract condemned in cause No. 3683. The petition in No. 3767 contained the following allegation:

"That your petitioner by naming herein any person or persons as owners or otherwise interested does not admit or intend to admit that any person or persons so named have any right, title, estate, or interest in or to the bed of the Mississippi river below ordinary high water mark, or the meander line, as against your petitioner in the improvement of navigation of said river."

On December 11, 1933, the District Court granted the condemnation, and on motion of the Government it made an order on January 23, 1934, reducing the easements condemned to an elevation of 667 feet above mean sea level datum (1912 adjustment). This included the easement of appellee's right of way. The commissioners filed their award on May 28, 1934, for the flowage easement condemned on appellee's right of way in the sum of $81,194. From this award the Government appealed to the District Court.

The claims of appellee before the commissioners in causes numbered 3683 and 3767 embraced approximately the same portion of its right of way. All the flowage rights on appellee's property sought by the Government in the second suit had been included in the original suit. For the purpose of trial they were consolidated in the District Court. The cases were tried to a jury which, at appellant's request, returned a special verdict by way of answers to interrogatories[1] finding for appellee in the

---

[1] Verdict.

We, the jury duly impaneled and sworn to try the issues in the above entitled actions, for our verdict find as follows:

First Question: Is the Chippewa River a navigable water of the United States?
Answer: No.

Second Question: Is Beef Slough a navigable water of the United States?
Answer: No.

Third Question: Is that portion of Beef Slough extending from the Mississippi River around islands 35 and 38 past the mouth of Beef River, a navigable water of the United States?
Answer: No.

Fourth Question: Is Beef River, up to and including Beef Lake, a navigable water of the United States?
Answer: No.

Fifth Question: Are Beef River and Beef Lake navigable waters of the State of Wisconsin?
Answer: No.

Sixth Question: Do you find the elevation of the ordinary high water of the Mississippi River in and from Lake Pepin to Lock and Dam No. 4 at Alma, Wisconsin, to be as claimed by the Government or as claimed by the Railroad Company?
Answer: Railroad Company.

(Answer this question by writing in the name "Government" or "Railroad Company" as you find the fact to be.)

Seventh Question: How many cubic yards of riprap will be required for the Railroad Company's railroad embankment after the pool is created by Lock and Dam No. 4?
Answer: 38,340 Cubic Yards.

Eighth Question: What is the cost for riprap in place on the Railroad Company's railroad embankment?
Answer: $81,043.55.

Ninth Question: Will the creation of the pool of water by Lock and Dam No. 4 require any raise or extension of the Railroad Company's Bridge at Beef River?
Answer: Yes.

Tenth Question: If your answer to the previous question is "no", do not answer this question. If your answer to the previous question is "yes", then answer this question:
How long will it be before it will be necessary to raise or extend the Beef River Bridge after the pool created by Lock and Dam No. 4?
Answer: From one to fifteen years.

Eleventh Question: If your answer to question nine is "yes," then answer this question:
What will be the cost of restoring the Beef River bridge to its present condition as to safety and adequacy?
Answer: $137,098.76.

Twelfth Question: Will the pool when created by Lock and Dam No. 4 require

aggregate amount of $347,811.65, that is to say, $400 by way of compensation for appellee's interest in the 1.6 acres, and $347,411.65 for damages proximately caused by the continuous maintenance and operation of the Alma dam at a pool level no higher than 667 feet above mean sea level at the dam.

At and above the Alma dam for a distance of ten or twelve miles, the Mississippi valley consists of a flat alluvial flood plain about three miles wide, extending

any raise or extension of the By Golly Creek bridge No. 359.49, above the raise and extension which the Railroad Company proposes to do at its own expense?

Answer: Yes, raising.

Thirteenth Question: If your answer to the previous question is "no," then do not answer this question. If your answer to the previous question is "yes," then answer this question:

How long will it be before it will be necessary to raise and extend By Golly Creek bridge after the pool is created by Lock and Dam No. 4?

Answer: From one to five years.

Fourteenth Question: If your answer to the Twelfth Question is "yes," then answer this question:

What is the cost of that portion of the raise and extension of By Golly Creek bridge attributable to the pool to be created by Lock and Dam No. 4?

Answer: $9,000.00.

Fifteenth Question: Will the pool when created by Lock and Dam No. 4, require any raise or extension of the 2nd, 3rd, 4th, 5th, 6th and 7th overflow bridges in the Chippewa bottoms?

Answer: Yes—to be raised.

Sixteenth Question: If your answer to the previous question is "no," then do not answer this question. If your answer to the previous question is "yes," then answer this question:

How long will it be before it will be necessary to raise or extend the overflow bridges, Nos. 2 to 7 inclusive, after the pool is created by Lock and Dam No. 4?

Answer: From one to five years.

If your answer to the Sixteenth Question is "yes." then answer questions Nos. 17, 18, 19, 20 and 21 and 22.

Seventeenth Question: What is the cost of the raise of the 2nd overflow bridge No. 360.39?

Answer: $5,759.89.

Eighteenth Question: What is the cost of the raise and extension of the 3rd overflow bridge No. 360.54?

Answer: $8,561.21.

Nineteenth Question: What is the cost of the raise of the 4th overflow bridge No. 360.74?

Answer: $18,066.33.

Twentieth Question: What is the cost of the raise and extension of the 5th overflow bridge No. 361.00?

Answer: $9,620 09.

Twenty-first Question: What is the cost of the raise and extension of the 6th overflow bridge No. 361.31?

Answer: $9,000.00.

Twenty-second Question: What is the cost of the raise of the 7th overflow bridge No. 361.46?

Answer: $26,401.93.

Twenty-third Question: Will the pool to be created by Lock and Dam No. 4 require any grade raise in the Chippewa river bottoms from railroad station 18970 to 19115?

Answer: Yes.

Twenty-fourth Question: If your answer to the previous question is "no", then do not answer this question. If your answer to the previous question is "yes", then answer this question:

How long will it be before it will be necessary to raise the grade in the Chippewa River bottoms from railroad stations 18970 to 19115 after the pool is created by Lock and Dam No. 4?

Answer: From one to five years.

Twenty-fifth Question: If your answer to question 23 is "yes" then answer this question:

What is the cost of the grade raise required in the Chippewa River bottoms from railroad stations 18970 to 19115?

Answer: $25,225.20.

Twenty-sixth Question: Will the pool to be created by Lock and Dam No. 4 require any extension of the bridge over Rush River, No. 379.93?

Answer: Yes.

Twenty-seventh Question: If your answer to the previous question is "no", then do not answer this question. If your answer to the previous question is "yes", then answer this question:

How long will it be before it will be necessary to extend the bridge over Rush River, No. 379.93, after the pool is created by Lock and Dam No. 4?

Answer: One to five years.

Twenty-eighth Question: If your answer to question 26 is "yes," then answer this question:

What is the cost of extending the bridge over Rush River, bridge No. 379.93?

Answer: $17,634.69.

Twenty-ninth Question: What sum of money will be just compensation to the Railroad Company for the 1.6 acres ap-

northwesterly from the dam between high rock bluffs. Larger floods cover the entire valley floor, except for occasional ridges and knolls which extend above the extreme high water. The main channel of the river in this area is the boundary between Minnesota and Wisconsin.

From a point about twelve miles upstream from the dam, the Mississippi valley floor lies at a much lower level and is covered with water ranging from a few feet to forty feet in depth, constituting a segment of the river, known as Lake Pepin, approximately twenty miles in length, and from two to three miles wide in places.

The two longest tributaries of the Mississippi in this region are the Beef and Chippewa rivers, which enter from the Wisconsin side. The Beef River drains about 440 square miles and enters the Mississippi, through Beef Slough, about a mile and a half above the dam. The Chippewa drains an area of 9480 square miles and enters the Mississippi about 10.7 miles above the dam. Both tributaries have valleys similar to the Mississippi but vary in width in proportion to the size of the stream. The valley of Beef River is about three-fourths of a mile wide near its mouth and becomes narrower towards its source. The Chippewa is about four miles wide at its mouth, and narrows down to about a fourth of a mile at a point fifteen miles from its mouth. The floors of these tributary valleys are also subject to inundation when they are in flood. A small tributary, known as Rush River, draining an area of about 200 square miles, enters Lake Pepin from the Wisconsin side twenty-eight miles above the dam. It is about eighty feet wide at its mouth.

Appellee's railroad in the vicinity of Alma extends along the easterly bank of the Mississippi. Originally a portion of its tracks in front of Alma, and at the site of the lock and dam, was constructed on trestles, which was subsequently filled in with sand, gravel, earth, or other suitable substance, under claimed authority of an ordinance of the village of Alma, dated February 3, 1902. Upstream from the dam the railroad was constructed along bluffs

for a distance of one and one-half miles, from which point, prior to 1928, it followed a winding course for several miles along the easterly bank of Beef Slough, continuing northwesterly and inland through the village of Nelson, Wisconsin, across the Chippewa River bottoms, over the main channel of the Chippewa at a point about one and one-half miles from the Mississippi, and then along the easterly shore of Lake Pepin. The railroad crosses Rush River at a point about one and one-half miles from the Mississippi. Rush River is located seventeen miles northwesterly from the Chippewa and twenty-eight miles from the Alma dam. Prior to 1928 the railroad crossed Beef River just above the point where it entered the channel of Beef Slough, which is about one and one-half miles upstream from the dam.

In 1927 appellee obtained a permit from the Secretary of War, revocable at the will of the latter, authorizing it to dredge Beef Slough at points near Alma to a depth not exceeding thirty feet nor within one hundred feet of any wing dam or main bank, and to use the dredged material for railroad embankment in accordance with plans shown on the drawings attached thereto, subject, however, to the conditions set forth in the permit forbidding impairment of navigable capacity, providing for the protection or removal of structures when future operations of the Government might require, without cost to the Government, and prohibiting unreasonable interference with navigation. The maps attached to the permit disclosed the work sought to be done and the manner in which it was to be accomplished. Pursuant to that permit appellee constructed an embankment across the abandoned channel of Beef Slough, diking or damming it in two places. It constructed a bridge, however, in the center of this embankment over a diversion ditch, through which the waters of Beef River were diverted at right angles to Beef Slough, and permitted to run into the Mississippi. In the state of nature, the waters of Beef River flowed into the channel of Beef Slough across which the embankment was constructed. That channel was perhaps

propriated by the Government for the site of the Alma Lock and Dam?

Answer: $400.00.

Thirtieth Question: What sum of money will be just compensation to the Railroad Company for any damage to the remainder of the Railroad Company's

property which you find, if any, from the evidence will be proximately caused by the continuous maintenance and operation of the Alma Dam at a pool level no higher than 667 feet above mean sea level at the dam?

Answer: $347,411.65.

three hundred feet in width, and in one place the water in Beef Slough was from ten to fourteen feet deep. The diversion ditch was sixty feet wide and five feet deep.

The primary question here presented first arose in cause No. 3683, when the court ordered the Government to make its petition more specific by filing plans of the proposed lock and dam, or sufficient information with respect thereto, to enable appellee to make proof of damage, if any, to the remainder of its property other than the 1.6 acres therein sought to be condemned for the site of the lock and dam.

██ It is contended by the Government that it was entitled to appropriate the 1.6 acres, and in so doing it was not liable to appellee in that action for damages accruing by reason thereof to the remainder of appellee's property. We do not understand this to be the law. In United States v. Grizzard, 219 U.S. 180, 31 S.Ct. 162, 163, 55 L.Ed. 165, 31 L.R.A.(N.S.) 1135, the Court said: "Whenever there has been an actual physical taking of a part of a distinct tract of land, the compensation to be awarded includes not only the market value of that part of the tract appropriated, but the damage to the remainder resulting from that taking, embracing, of course, injury due to the use to which the part appropriated is to be devoted." That rule has been undeviatingly followed, both by prior and subsequent decisions, and it constituted ample authority to warrant the court requiring appellant to make its complaint more specific by describing the intended use of the 1.6 acres. Before making the order the court was not required to pass upon the merits of appellee's claims for they were not yet filed. Indeed, they could not be, until the information upon which they were based was presented by appellant as a result of the order.

At the trial the Government's theory was developed more clearly, and appellee's claims were presented with particularity. The latter extended over a territory twenty-eight miles in length immediately above the dam, and included damages at Beef Slough, the Chippewa river and valley and Rush River, which appellee claimed were proximately caused by the dam impounding the water.

In the meantime, after the commissioners had made their award in Cause No. 3683, which included damages to appellee's property at Beef Slough, the Government filed its second suit, No. 3767, by which it sought to condemn a limited flowage easement at Beef Slough, alleging that it had already appropriated the land upon which the dam was to be constructed. This, of course, included the 1.6 acres referred to in cause No. 3683. At this time there had been a change in the personnel of the District Court by virtue of the appointment of a new judge. The matter was referred to commissioners who reported damages in the second suit and from that report appellant also appealed to the District Court.

██ Both appeals being consolidated for trial, appellee proceeded on the theory, which the court adopted, that by virtue of the physical appropriation of the 1.6 acres, the Government impliedly agreed to compensate appellee for all proximate damages to its remaining property occasioned by the construction and use of the dam, and that recovery therefor was authorized by the Tucker Act, 28 U.S.C.A. § 41 (20); that unless appellee presented all of its claims for proximate damages to its remaining property at the time of the physical appropriation of the land it would be barred thereafter from recovering those omitted. Obviously appellee's contentions in these respects are sound. True, appellee was permitted subsequently to prove damages at Beef Slough which already had been proved, over the Government's objection, in the first suit, but that was because of the Government's voluntary act in bringing the second action, which seems to us to have been superfluous, and inconsistent with the rule in United States v. Grizzard, supra. If appellee had not asked that the complaint in the first action be made more specific, or if it had not presented its claim in that action for damages to its remaining property, but had merely gone to award on the value of its interest in the 1.6 acres of land, it might have been placed in a very embarrassing situation in its effort to recover damages to the remaining property on the theory of an implied contract, especially if the Government had chosen not to file any subsequent action for flowage easements, and certainly it was not necessary for it to do so. Moreover, if, under such circumstances, it subsequently filed the second suit for the flowage easement at Beef Slough, that of itself would have furnished no basis for proving damages at the Chippewa or Rush river, for the injurious flowage at Beef Slough was not the cause of the damage at the other places. The prim-

ary cause of the damage at each place was the construction and use of the dam on the land that was physically appropriated for that purpose, including the 1.6 acres. The Government contends, however, that as a result of the court's theory it was compelled to accept and pay for more rights than it asked. This might be true, under a given state of facts, with respect to the second suit, and it furnishes an additional reason for the consolidation. The objection is not tenable as to the first action, because by its filing the Government impliedly agreed to pay for all damages to the remaining property, proximately caused by the use of that which it had physically appropriated. Hence it will be presumed to have demanded the right to cause the damage for which it was liable.

The character of appellant's contention in this respect would seem to recognize the rule in the Grizzard Case, supra, and to manifest a legitimate purpose to place appellee, if it could, in the position to which we have just made reference. Hence, we think the court properly consolidated both cases for trial, thus not only avoiding any duplication of damages, and perhaps a multiplicity of suits, but securing to appellee an opportunity to have adjudicated all of its damages, if any, for which the Government was liable by reason of the physical appropriation of appellee's land for its intended use.

True, there may have been instances of condemnation of land by the Government, where the taking constituted a sufficient basis for an implied promise on the part of the Government to compensate the owner for all proximate damages to his remaining land, and yet no damages were allowed. This was not because of any departure from the rule of measurement, but because the damage was uncertain, remote, speculative, or not proximately caused by the taking, or was caused by some intervening agency for which the Government was not liable. Likewise there have been cases where there was no physical appropriation, hence there was no implied promise, and the actions were based solely on tort for which the Government is never liable, and for which no citizen can sue. None of these cases is in conflict with the Grizzard Case. Illustrative of these cases is Christman v. United States, 74 F.(2d) 112, decided by this court. There an old dam in the Ohio River, at Louisville, was replaced by a new one eight feet higher than the old

one. It was of modern type which permitted the wickets to be lowered, and they were always lowered in time of flood, so that at those times the river had an unobstructed flow. Appellant owned a farm on a nonnavigable tributary creek of the Ohio. The mouth of the creek was 54 miles up-stream from the dam, and the farm was 4 miles up the creek. There was no permanent filling of the creek channel as a result of the new dam. A part of Christman's land was overflowed by the creek as a result of freshets from adjacent hills, and by backwater from the Ohio in times of flood. That had always been true and the dam had not affected the frequency, the extent or the duration of the overflows. The Government had not appropriated any part of the owner's land by condemnation, or otherwise, and under those circumstances we sustained the finding of the District Court that there was no damage as a proximate result of the new dam for which the Government was liable.

In United States v. Chicago, B. & Q. R. Co. (C.C.A.) 82 F.(2d) 131, 106 A.L.R. 942, the Government had condemned a certain floodway easement on and over a part of this appellee's right of way and embankment near Hastings, Minnesota. It was made necessary by the construction of a dam in the Mississippi, as a part of the general navigable improvement plan of that river, out of which the subject matter of the instant case arose. The court there, in a clear and well-considered opinion, distinguishes the classes of cases to which we have referred, from the rule in the Grizzard Case, which it followed. It is sufficient to say, without further discussion, that we concur in the conclusions of the Eighth Circuit in that case in following the rule in the Grizzard Case.

It is contended by the Government that the verdict of the jury was based on damages which were consequential, remote and speculative. We think it can not be denied that all the damages covered by the verdict were indeed very real, and were quite conservatively estimated on substantial evidence. But, of course, if they were not proximately caused by the physical appropriation of the 1.6 acres, and the uses to which it was put, the verdict and judgment to that extent would be erroneous. Aside from the questions hereinafter discussed, however, we are convinced that all the damages covered by the verdict were prox-

imate, and were not speculative, consequential or remote.

The record is quite voluminous and it would be impracticable to attempt to treat in detail the evidence affecting each item of damage. As this contention involves questions of fact we shall consider generally the evidence which we think substantially supports the verdict and judgment. The soil in this area is quite subject to erosion. The tributary rivers here involved carry enormous amounts of silt annually into the Mississippi which in turn, before the construction of the dam at Alma, carried it, or a greater portion thereof, down stream. The Chippewa, due to the declivity of its channel, has a very rapid flow, and hence deposits more silt in the Mississippi than any other stream in that area. It is illustrative, however, of what happened in a lesser degree with respect to all the streams. When the Mississippi was at normal low water mark it readily received the silt from the Chippewa, but at high water stage the waters of the Mississippi backed up into the mouth of the Chippewa, thus retarding the Chippewa's flow and causing the silt to be deposited in its bed. When the waters subsided in the Mississippi, the current of the Chippewa again carried its silt, and much of that which had been deposited, into the Mississippi. It was said that the excessive deposits of silt from the Chippewa in years gone by had raised the bed of the Mississippi at this point, which resulted in the formation of Lake Pepin, just above it. The deposit of silt in the Chippewa, under circumstances as above stated, had caused the waters of the Chippewa to overflow its banks, thus causing distributaries, some temporary, and others of a more or less permanent character. It was said, without denial, that Beef Slough had its origin, many years ago, as one of such distributaries. It wended a devious course down the Chippewa Valley and entered the Mississippi at a point about nine miles below the mouth of the Chippewa. Fifty years ago Beef Slough was navigable, as was also the Chippewa, for quite a distance above its mouth. A few industries were located upon Beef Slough and used it as a means of transportation, the principal one being a logging company, which conducted an extensive business. The waters of Beef River likewise carried enormous amounts of silt, and on account of excessive deposits in its bed, it became less navigable throughout the years, and for that

reason the logging company ceased business and moved its plant in 1889. The course of Beef Slough in numerous places has changed by the formation of distributaries, and many places which used to constitute the bed of the Slough have been covered with trees and vegetation for many years and are now used as pasture land. For many years there have been no industries located on it, and it has not been used for navigable purposes. Several years ago the Government constructed a dam and wing walls at or near the mouth of the Slough for the purpose of protecting and preserving the channel of the Mississippi against the ravages of the Slough, and they are referred to as a matter of special care to the Government in the permit issued to appellee by the Secretary of War, which has been hereinbefore referred to.

The damages awarded by the verdict were caused by the necessity of appellee raising and protecting its embankment, and raising and extending its bridges. They are especially referred to in interrogatories numbered 7 to 28, inclusive. The thirtieth merely asks for the total amount of the damages. Aside from the question of liability, it is obvious to us that the damages referred to in the 7th and 8th interrogatories were proximately caused by the dam. It would seem that this fact was conceded by the Government, except as to amount, by filing its second suit.

The other items of damage are based on the theory that the permanent raising of the water in the Mississippi above its natural flow will hold back the natural flow of its tributaries, causing the deposit of silt therein, thus raising the floors of the tributaries, which in turn will cause their overflow and the formation of distributaries, thereby flowing the water against appellee's embankments, which in their present condition are not of sufficient height to withstand it, nor are their bridges of sufficient height and length to permit the water to pass. There is no doubt of the happening of this condition. It was not controverted. The only uncertainty involved related to the time when it would occur. The jury's answers in this respect were based on substantial evidence from witnesses whose reputation and integrity were unquestioned and whose ability and knowledge were unassailed. We think the answers were fully justified, and that the damages awarded were the proximate result

of the building of the dam; that there was no independent intervening cause; and that the damages were neither remote, consequential nor speculative.

■■ The public easement of navigation is limited to the natural levels, widths and flows of navigable streams, and riparian owners have a right to erect and maintain their properties in reliance upon those limitations. True, the burden of the natural servitude may be increased by the Government, but not without just compensation. United States v. Cress, 243 U.S. 316, 37 S.Ct. 380, 61 L.Ed. 746; United States v. Lynah, 188 U.S. 445, 23 S.Ct. 349, 47 L. Ed. 539; United States v. Chicago, B. & Q. R. Co., supra; United States v. Wheeler Township (C.C.A.) 66 F.(2d) 977. Appellee's properties were constructed in reliance upon the natural level, width and flow of the Mississippi in this area. True, it was subjected to attendant inconveniences and perhaps damage by floods and temporary high waters, but appellee's properties were constructed with that in view. The line of ordinary high water divides the upland from the river bed. The river bed is the land upon which the action of the water has been so constant as to destroy vegetation. It does not extend to nor include the soil upon which grasses, shrubs and trees grow. Harrison v. Fite (C.C. A.) 148 F. 781. Beyond that point the Government can not go without compensation for proximate damages.

■ It is contended by the Government that the impounded water does not, and will not, extend beyond the ordinary high water line. The location of this line was disputed. The answer to interrogatory No. 6, submitted at the request of appellant, settles that dispute so far as this court is concerned, for it is supported by substantial evidence. A preponderance of the evidence supports appellee's contention that the impounded water will extend above the ordinary high water mark as established by the jury, especially if the water is maintained at a mean sea level of 667 feet at the dam, as provided by the plans and as now constructed. The Government attempts to parry this fact by the statement that, although the construction is sufficient to create such a mean sea level at the dam, the Government intends to maintain at that point only such water level as will maintain a mean sea level of 667 feet throughout the pool. It accordingly asked, at the

conclusion of the evidence, for a nunc pro tunc order permitting it to amend its complaint by substituting the words "throughout the pool area" for the words "at the dam," in the following averment: "The dam shall have a crest elevation of 667 mean sea level intended to provide a pool no higher than 667 at the dam." This request was denied by the court and we think rightly so. The dam was constructed, the right of use to its full capacity was fixed, and appellee's damages could not then be limited by an averment that the Government did not intend to exercise its full right. Moreover, an elevation of 667 throughout the pool would include that portion of the pool next to the dam, and no matter what the elevation be at the dam it is bound to be higher further up stream. It can not be the same at one time throughout the pool. Under these circumstances the railroad's compensation must be based upon the maximum use of the right acquired, rather than upon its maximum intended use. Western Union Telegraph Company v. Polhemus (C.C.A.) 178 F. 904, 29 L.R.A.(N.S.) 465.

■ It is further contended by the Government that the Chippewa and Beef rivers and Beef Slough are navigable waters of the United States, and that Beef River and Beef Lake are navigable waters of Wisconsin, hence the Government may, in the improvement of navigation, permanently raise the water level to the line of ordinary high water without liability. The answers to interrogatories numbered 1, 2, 3, 4 and 5 are determinative of this contention of navigability adversely to appellant. The answers are supported by substantial evidence which is quite convincing. See Harrison v. Fite (C.C.A.) 148 F. 781. By submitting these interrogatories appellant must have assumed, as we do, that they involved mere questions of fact. The answers thereto being supported by an abundance of substantial evidence we can not disturb them.

■ It is also contended by the Government that appellee's property at certain places is constructed within the bed of the Mississippi. This contention refers more particularly to the 1.6 acres, and the embankment and tracks across Beef Slough. The answers to the interrogatories are utterly inconsistent with this contention. A perusal of the record convinces us that the contention is not sound, and the filing of

the two condemnatory actions, wherein the Government impliedly agreed to pay damages therefor, gives us further assurance that our conclusion in this respect is correct. Appellant, however, regards the permit of the Secretary of War, and the application therefor, as an admission on the part of appellee that the Slough was a part of the Mississippi and was navigable. The facts of this record, however, disclose that the Slough was never a part of the Mississippi, except as a tributary, and that neither the Government nor the State of Wisconsin has regarded it as navigable for almost fifty years, except for the Government's claim in the belated hours of these actions. The acts of appellee with respect to the permit may well be considered as merely precautionary, and they raise no inference against it. It is also noted that the land office surveyors had meandered the Slough and perhaps all other waters here involved, but that fact raises no inference as to their navigability because the land office had no authority to determine that fact. Oklahoma v. Texas, 258 U.S. 574, 42 S.Ct. 406, 66 L.Ed. 771; United States v. Ladley (D.C.) 4 F.Supp. 580.

Eight years after appellee had constructed its embankment across Beef Slough, and almost two years after the trial of these cases, the Secretary of War revoked the permit. This was of no avail to the Government's right to prevail in these actions, first, because the waters of Beef Slough are not navigable; second, because the dredging had already been accomplished, and before it could be removed under the terms of the permit, if at all, it must have appeared that future operations by the United States required an alteration in the position of appellee's authorized structures, or in the opinion of the Secretary of War, it would cause unreasonable obstruction to the free navigation. None of these facts were found by the Secretary of War, and there was no hearing upon them. We think Miami Beach Jockey Club v. Dern, 65 App.D.C. 369, 83 F.(2d) 715, upon which the Government relies, is not in point. In that case there was a hearing before any work had been done, and the waters involved were navigable.

It is further contended by the Government that appellee failed to establish any interest in the 1.6 acres condemn-

ed in Cause No. 3683. The action was required to be prosecuted in accordance with the laws of Wisconsin. See 33 U.S.C.A. § 591. It is the law of that state that where proceedings are instituted to condemn property, and the petition recites, as it must, title and ownership or interest by the defendant, the condemnor is thereby bound by such expressed recognition of title, and cannot be heard to assert the contrary nor compel one recognized as owner to prove or defend his title. Murray Hill Land Co. v. Milwaukee L., H. & T. Co., 126 Wis. 14, 104 N.W. 1003; Skalicky v. Friendship Electric Light & Power Co., 193 Wis. 395, 214 N.W. 388. The complaint in No. 3683 did not directly allege ownership in appellee, but rather a claim of ownership, and we are inclined to think that was sufficient under section 32.04, Wisconsin Statutes (1929). During the trial the Government never made any claim that it owned any part of this land, but tacitly acquiesced in appellee's claim of ownership, and by instituting the action impliedly promised to pay for its value. Some of the purported title papers introduced without objection perhaps did not constitute the best evidence, such as uncertified copies and the like, but under the issues presented, appellee was not required to prove a merchantable title. See Tenney Telephone Co. v. United States (C.C.A.) 82 F.(2d) 788. There was no adverse claim presented to appellee's claim, and there was testimony given that the 1.6 acres was a part of appellee's right of way through Alma, which it had owned and used as a right of way since 1884. This we think was sufficient to establish appellee's claim of title.

The Government further contends that admittedly the By Golly Creek bridge was erroneously constructed too low to meet conditions as they were before the dam was built, and that is true. But appellee at the trial expressed its willingness to pay for curing that error, and its correction by appellee was contemplated by interrogatory 12, submitted by appellant. The answer is responsive thereto in view of the evidence with respect to the entire cost of the new bridge as it should now be. In other words, the evidence discloses that appellee will be required to pay considerably more for the new bridge at that point than the amount of the award in answer to interrogatory No. 12.

Many other contentions were made by the Government, including divers objections to the court's rulings with respect to the admission of evidence. All these we have examined where there were proper objections made and proper exceptions saved, and we find no reversible error.

The Government also contends that the court erred in giving and refusing to give certain instructions. We are convinced that those refused were properly denied, and that those given, considered as a whole, constituted as fair a presentation of the law on the issues involved as the Government was entitled to.

The Government further contends that the court erred in not requiring the jury to return a separate verdict in each case. There is no merit in this contention. At the close of the evidence the Government filed its written motion for a special verdict and tendered therewith 37 interrogatories for the jury to answer. The motion was entitled United States * * * vs. Certain land in Buffalo County, Wisconsin, containing 1760 acres; * * * et al., No. 3683 Law, No. 3767 Law. Of the interrogatories submitted to the jury those numbered 1 to 28 inclusive, were identically, or substantially, the same as twenty-eight of those requested by the Government. Those submitted to the jury, numbered 29 and 30, were not included in the Government's request. The answer to interrogatory 29 is a complete answer to the question raised by the issues in the first action according to appellant's contention. That, plus the answer to interrogatory 30, is completely responsive to the issues raised in the first action according to appellee's theory, and it includes the issues attempted to be raised by the second suit. The answer to interrogatory 30 is the aggregate of the answers to interrogatories numbered 8, 11, 14, 17, 18, 19, 20, 21, 22, 25 and 28, all of which were submitted, and answers requested thereto, by appellant. Under these circumstances there was no error in the form of the verdict, and if there were, it was invited by appellant.

Appellant has raised a question with respect to the return of the verdict which we shall now consider. The jury had reported an agreement in open court, and thereupon the interrogatories and answers were read aloud by the court. They dif-

fered from those hereinbefore set forth in the margin only in the following particulars: The answer to the sixth question was "Meyer" instead of "Railroad Company." Meyer was a witness for the Company. The twenty-sixth question was answered "No." The twenty-seventh and twenty-eighth questions were unanswered. The answer to the thirtieth question was $17,634.69. The Court then said:

"Apparently, gentlemen, I did not make it clear to you just what you should consider in determining the amount of compensation on the thirtieth question this morning. It is impossible to reconcile that answer with the other findings in the special verdict. You recall there was one finding as to the true compensation for the land actually taken; that was the 1.6 acres. Now, the last answer should be the sum total of the amounts that would be the true compensation for all the rest of the damages the railroad company suffered, if any. Have I made myself clear now?"

A juror: "I think so."

The Court: "I think, with that understanding, gentlemen, I will let you go back, unless the answer to the thirtieth question was computed on that basis. You see your answer to the thirtieth question is $17,634.69, which would represent the total damage which the railroad company suffered—no, which would represent the true compensation that the railroad company would be entitled to over and above the $400 for the taking of the 1.6 acres."

The Foreman: "Yes."

Mr. Crawford (counsel for appellant): "Before the jury retires * * * Comes now the United States of America and excepts to the additional instructions of the court after the jury has returned its special verdict, having answered all the questions, and particularly the thirtieth question, and to that portion of the instructions stating it would be impossible to reconcile the answer to the thirtieth question in view of the answers to the other questions, and to the instruction that the answer to the thirtieth question should be the sum total of all the damages, for the reason it is misleading and prejudicial, and does not permit the jury to independently ascertain the thirtieth question without respect to the other questions."

Thereupon the jury retired to the jury room and within a short time reported their

verdict in open court, whereupon the following colloquy ensued:

"The Court: Gentlemen, have you reached your verdict?

"The Foreman: Yes sir (handing verdict to the court).

"The Court: Have you made any corrections in your answers?

"The Foreman: Yes sir.

"The Court: What answer?

"The Foreman: On the Beef River bridge,—or Rush River bridge I should say.

"The Court: You may advise me what answers you have changed since you were here a few moments ago.

"The Foreman: The sum of $17,634.69 was carried over to the partial extension of the Rush River bridge, instead of being on here as formerly.

"The Court: Then your answer to the thirtieth question is $347,411.65?

"The Foreman: Yes sir.

"The Court: That is the only change you have made?

"The Foreman: Yes sir. Will the other be stricken out?

"The Court: Yes. The verdict as now submitted will be your verdict.

"The Foreman: Yes sir."

Thereupon, at the request of the Government, the jury was polled and each juror answered that the verdict was his. Under the circumstances set forth we think the Government's contention in this respect is without merit. The difficulty was no doubt occasioned by the unfortunate wording of the thirtieth question. The jury in its original verdict construed the word "remainder" to mean one thing, and the court construed it to mean another. Each construction is reasonably supported by the language used in the question, and if logically followed will produce precisely the same result. We find nothing in the additional instructions which can be considered as a usurpation of the powers of the jury, or that in any way influenced it in arriving at its verdict.

We think the verdict is supported by the evidence, and that the judgment is supported by the verdict.

Judgment affirmed.