**UNITED STATES v. DICKINSON.**

**SAME v. WITHROW.**

Nos. 5419, 5420.

Circuit Court of Appeals, Fourth Circuit.

Jan. 4, 1946.

Roger P. Marquis, Atty., Department of Justice, of Washington, D. C. (J. Edward Williams, Acting Head, Lands Division, Department of Justice, of Washington, D. C., and Leslie E. Given, U. S. Atty., of Charleston, W. Va., on the brief), for appellant.

Ernest K. James, of Charleston, W. Va., for appellees.

Before SOPER, Circuit Judge, and COLEMAN and BARKSDALE, District Judges.

SOPER, Circuit Judge.

These appeals were taken by the United States from judgments against it in two suits brought by landowners under the Tucker Act, 28 U.S.C.A. § 41 (20), to recover compensation for the taking of their lands and for the erosion and intermittent flooding thereof caused by raising the water level of the Kanawha River in South Charleston, West Virginia, by the erection and operation of the Winfield Lock and Dam.

Dickinson's land consisted of a tract 3.1 acres in extent which bounded on the low-water mark of the river for a distance of 411 feet. Dickinson acquired the land on August 16, 1937, and between that date and September 22, 1938, which the court found to be the date of the taking, he made substantial improvements thereon in the form of grading and filling, construction of sewers, water and gas lines, the installation of a gasoline filling station and the erection of a large residence near the top of the river bank. By reason of raising the level of the river and the operation of the dam 0.22 acre of land was permanently submerged and 0.10 acre thereof lying between the elevation of 566 feet and 574 feet above mean sea level will be subject to intermittent flooding. The court found that on September 22, 1938, the 0.22 acre permanently flooded had a fair market value of $400 and the flowage easement to flood intermittently the 0.10 acre a fair market value of $75.

The court also found that during the latter raises in the stage of the river, and after the attainment of the present permanent level of 566 feet, considerable erosion of the residue of the plaintiff's property at the river bank occurred which was caused by the saturation and softening of the soil and the wave action thereon that resulted from the permanent flooding of the 0.22 acre of the plaintiff's land. For the damages caused by this erosion the District Judge allowed the property owner the sum of $4,245.63 on the theory that for this sum appropriate protective work along the river bank to prevent the erosion, consisting of a rock toe wall and stone riprapping up to an elevation of 569 feet, could have been installed.

Withrow's property is a tract of land, containing a number of city lots, and fronting on the river approximately 180 feet. The District Court found that 0.11 acre thereof was permanently submerged and 0.04 acre will be subject to intermittent flooding as the result of the raising of the level of the river and the operation of the dam. The court found that the land was taken on September 22, 1938, and that then the fair market value of the land permanently submerged was $200 and the fair market value of the flowage easement to flood intermittently the 0.04 acre was $35.

The court also found that, during the latter stages in the rise of the river and after the attainment of the permanent pool stage of 566 feet above mean sea level, considerable erosion to the residue of the property at the river bank was caused by the saturation and softening of the soil and the wave action thereon which was the direct and proximate result of the taking of the 0.11 acre permanently flooded. For the damages caused by the erosion the court allowed the sum of $1,859.40 on the theory that for this sum of money the owner could have erected a rock toe wall and stone riprapping to an elevation of 569 feet above sea level which would have protected the property from erosion.

The first important contention raised by the United States is that both suits were barred by limitations under the Tucker Act because they were not instituted until the month of April, 1943, the complaint of Dickinson on April 1 and the complaint of Withrow on April 10, more than six years after the rights of action accrued. The decision of this question depends upon the date upon which the taking of the plaintiffs' properties occurred and for this purpose it is necessary to consider the several steps which took place leading to the construction and completion of the dam and the raising of the river from time to time as the pool was filled. The improvement of the river to support a 9 foot channel by substituting four new locks and dams for those previously in place was authorized by the Acts of July 3, 1930, 46 Stat. 918, 928,

and August 30, 1935, 49 Stat. 1028, 1035. The Winfield Lock and Dam was constructed under the authority of these Acts, and on July 1, 1936, notice was given to the holders of War Department permits in the area that the water elevation would be raised, and shrubbery and vegetation along the river banks were cut by the government. By October 21, 1936, construction of the dam had proceeded far enough to raise the elevation in the pool of a previous dam downstream from the plaintiffs' properties which, however, were not affected thereby. Subsequently the river was raised by the operation of the Winfield Dam at the plaintiffs' properties by gradual stages from a previous elevation of 554.65 to the present elevation of 566 feet above mean sea level, namely, on May 30, 1937, to 556 feet; on October 20, 1937, to 558 feet; on January 6, 1938, to 563.15 feet; on August 26, 1938 to 565 feet; on September 1, 1938, to 565.5 feet and on September 22, 1938, to 566 feet. The dam was officially inspected and accepted by the federal government on August 20, 1937.

The District Judge held that the cause of action in each case accrued on September 22, 1938, when the pool was filled and the river was finally raised to the contemplated new level of 566 feet, an increase of 11.35 feet over the former normal level, whereby the lands of the plaintiffs were permanently submerged as above described. Under this holding the suits of the plaintiffs instituted in April, 1943, were not barred by limitations. The United States, however, contends that the taking occurred and the right of action accrued on October 21, 1936, before the lands of the plaintiffs were actually invaded, but when the construction of the dam had proceeded far enough to raise the level of the pool downstream below the lands of the plaintiffs. Alternatively the government suggests that the taking occurred on May 30, 1937, when the level of the river opposite the plaintiffs' lands was first raised by the operation of the dam from 554.65 to 566 feet and plaintiffs' lands were first partially submerged. It will be observed that if the earlier date is accepted as correct, the pending suits were barred; but if the later date is accepted, the pending suits were brought in due time. In either event it is important to fix the precise date because it is said that the cases at bar were selected as tests to determine the legal principles to be applied in similar suits now pending in the District Court.

It is conceded by both parties that although the use of the lands by the United States was continuous, only one cause of action accrued; and this position is sustained by the decisions which hold that when a permanent structure erected by government authority results in the invasion of or damage to land, only one right of action arises and this accrues upon the completion of the structure and the happening of the injury, and in this action, all damages, past, present and prospective are recoverable. Suehr v. Chicago Sanitary District, 242 Ill. 496, 90 N.E. 197; Carpenter v. Lancaster, 212 Pa. 581, 61 A. 1113; King v. Board of Council of City of Danville, 128 Ky. 321, 107 S.W. 1189; 4 Sutherland on Damages, 4 Ed., § 1039; 1 Am.Jur., Actions, § 117.

The contention of the United States that the pending suits are barred by limitations rests primarily upon the decisions of the Court of Claims in County Court of Marion County, W. Va., v. United States, 53 Ct. Cl. 120, and Dooner et al. v. United States, 95 Ct. Cl. 392. In the first of these cases it was suggested that it might be said that the statute of limitations begins to run in cases of this kind when the dam is completed and put in operation, or when the first damage is suffered, or at some subsequent time when the taking is to be deemed complete. The case before the court concerned certain county roads which were occasionally invaded by intermittent floods alleged to be caused by the erection of a government dam which was completed and began to fill on November 3, 1903. The suit was not brought until November 5, 1911. The landowner claimed that the taking did not occur until 1911, contending that the statute did not begin to run until the cause of action was complete and the roads had been abandoned. But the evidence showed that all the roads were subject to intermittent flooding as soon as the pool filled and the court therefore rejected the landowner's contention and, without stating that the right of action accrued when the dam was finished or when the water first began to submerge the land, held that so far as there was any taking, it was complete when the water had reached pool level. The point was emphasized that the time of accrual of the right of action did not depend on the time when the county decided to abandon the use of the roads. Again, in the second cited case from the Court of Claims, Dooner et al. v. United States, 95 Ct.Cl. 392, 397, 399, it

was held that the owner of permanently flooded lands was entitled to interest from the date when the land was completely submerged.

We think that this is the rule to be applied in the cases now under consideration. The taking occurred in the course of the exercise by the United States of its right to improve the navigation of the river, but without prior condemnation or purchase of the land which it intended to invade. These circumstances gave rise to an implied contract to pay for the land taken, but the subject matter of the contract and the extent of the land to be taken were not established with certainty until the pool was raised to its permanent level. Until this occurred the whole matter was subject to government change and control and the taking was not complete. It is established that the mere fact that the government has undertaken a flood control project and completed a part thereof without the invasion of the land of abutting owners does not amount to a taking thereof. United States v. Sponenbarger, 308 U.S. 256, 265, 60 S.Ct. 225, 84 L.Ed. 230; Danforth v. United States, 308 U.S. 271, 286, 60 S.Ct. 231, 84 L.Ed. 240. An intention ultimately to use the land is not sufficient to constitute a taking under these circumstances.[1]

When we come to the merits of the case we find no denial of liability on the part of the United States for the value of the land permanently submerged or for the damage, if any, to the land from permanent intermittent floods caused by the operation of the dam. Both invasions, if found to exist, are conceded to be takings for which compensation must be paid by the government under the rules established by the decisions,[2] and the values placed by the District Judge upon the land are not attacked.

The decision of the District Judge is attacked principally because he allowed substantial compensation—$4,245.63 in the case of Dickinson and $1,859.40 in the case of Withrow—for the erosion and damage caused by the raising of the pool to the residue of the property not permanently submerged. The United States contends that the losses suffered by the landowners in this respect were not the result of a taking of the property in the constitutional sense, but were merely consequential damages attendant upon a public undertaking for which no recovery can be allowed by the courts. Many cases are cited[3] in which the courts have been called upon to consider damages to land from flooding or erosion caused by the erection of dams, dykes and other structures under governmental authority; and it has been necessary to draw the difficult line between the taking involved in the direct appropriation of private land for public use for which the United States is liable at the suit of the landowner, and the indirect consequential damages flowing from the construction of public structures which are recoverable only by act of Congress. These cases

---

[1] The intention of the United States to use the land of a private owner as a suitable field over which to fire heavy guns installed for the purpose may constitute a taking; Peabody v. United States, 231 U.S. 530, 34 S.Ct. 159, 58 L.Ed. 351; Portsmouth Harbor Land & Hotel Co. v. United States, 250 U.S. 1, 39 S.Ct. 399, 63 L.Ed. 809; but it is obvious that in such a situation, the existence of the intention itself deprives the owner of the use of his land and constitutes a taking.

[2] Pumpelly v. Green Bay & Mississippi Canal Co., 13 Wall. 166, 37 S.Ct. 380, 61 L.Ed. 746; United States v. Lynah, 188 U.S. 445, 23 S.Ct. 349, 47 L.Ed. 539; United States v. Cress, 243 U.S. 316, 20 L.Ed. 257; Jacobs v. United States, 290 U.S. 13, 54 S.Ct. 26, 78 L.Ed. 142, 96 A. L.R. 1; United States v. Sponenbarger, 308 U.S. 256, 267, 60 S.Ct. 225, 84 L.Ed. 230; United States v. Willis, 4 Cir., 141 F.2d 314, 316.

[3] Gibson v. United States, 166 U.S. 269, 17 S.Ct. 578, 41 L.Ed. 996; Bedford v. United States, 192 U.S. 217, 24 S.Ct. 238, 48 L.Ed. 414; Manigault v. Springs, 199 U.S. 473, 26 S.Ct. 127, 50 L.Ed. 274; Jackson v. United States, 230 U.S. 1, 33 S.Ct. 1011, 57 L.Ed. 1363; Hughes v. United States, 230 U.S. 24, 33 S.Ct. 1019, 57 L.Ed. 1374, 46 L.R.A.,N.S., 624; Cubbins v. Mississippi River Comm., 241 U.S. 351, 36 S.Ct. 671, 60 L.Ed. 1041; Horstmann Co. v. United States, 257 U.S. 138, 42 S.Ct. 58, 66 L.Ed. 171; Sanguinetti v. United States, 264 U.S. 146, 44 S.Ct. 264, 68 L.Ed. 608; United States v. Chicago, M., St. P. & P. R. Co., 312 U.S. 592, 313 U.S. 543, 61 S.Ct. 772, 85 L.Ed. 1064; United States v. Willow River Power Co., 324 U.S. 499, 65 S.Ct. 761; Salliotte v. King Bridge Co., 6 Cir., 122 F. 378, 65 L.R.A. 620; Franklin v. United States, 6 Cir., 101 F.2d 459; W. A. Ross Const. Co. v. Yearsley, 8 Cir., 103 F.2d 589; Cf. Coleman v. United States, C.C. N.D.Ala., S.D., 181 F. 599.

illustrate a variety of circumstances in which heavy damages from flooding or erosion took place and it was held that the United States was not liable for the loss sustained or for the cost of protective measures to prevent it.

But these decisions do not touch the specific point upon which the landowners here rely, for in none of them was there a permanent submersion and an acknowledged taking of any part of the land such as has occurred in the cases now before the court. The landowners rest their case in this respect on another line of authority which holds that when part of an owner's land is completely taken, he is entitled not only to compensation therefor but also to compensation for any damage occasioned to his remaining land. It was on this theory that the court below based its findings in the sums above stated for the cost of protecting the residue of the lands against erosion and flood damage. The court found as to the Dickinson property that between 5,000 and 7,000 cubic yards of the river bank broke off and slipped into the river, approximately thirty trees, ranging in diameter from six inches to one foot six inches, slipped into the river or were destroyed, and a large crack developed in the earth above the top of the river bank and extended through the foundation of Dickinson's residence causing substantial damage. This erosion and damage the court found to be due to the saturation and flooding of the soil and wave action as the direct and proximate result of the permanent flooding of the above described 0.22 acre of Dickinson's land.

With respect to Withrow's land the court made the similar finding that considerable erosion of the river bank abutting the property occurred, a substantial part of the bank broke off and slipped into the river, approximately twenty trees ranging in diameter from six to twenty-four inches slipped into the river or were destroyed, and the unpaved portion of the river road near its dead end in front of Withrow's residence subsided from four to eight inches. This erosion and damage was due to the same causes as in the case of Dickinson and was the result of the taking of the aforesaid described 0.11 acre of Withrow's land which was permanently flooded. The court also found that in view of the character and value of the properties as of September 28, 1938 when the pool was filled, it would have been sound economy for Dickinson to have spent the sum of $4,245.63 and for Withrow the sum of $1,859.40 to protect the residue of their respective properties against erosion and damages.

There is abundant authority to support this point of view, for example, United States v. Grizzard, 219 U.S. 180, 31 S.Ct. 162, 55 L.Ed. 165, 31 L.R.A.,N.S., 1135, where a part of a farm was taken for the purpose of improving the navigation of a stream by the erection of government locks and dams, and in addition an easement of access from the land to a public road was destroyed. The court held that the government was liable for the damage to the residue, saying (219 U.S. at pages 183, 184, 185, 31 S.Ct. at page 163):

" * * * Whenever there has been an actual physical taking of a part of a distinct tract of land, the compensation to be awarded includes not only the market value of that part of the tract appropriated, but the damage to the remainder resulting from that taking, embracing, of course, injury due to the use to which the part appropriated is to be devoted. * * *

"The constitutional limitation upon the power of eminent domain possessed by the United States is that 'private property shall not be taken for public use without just compensation.' The 'just compensation' thus guaranteed obviously requires that the recompense to the owner for the loss caused to him by the taking of a part of a parcel, or single tract of land, shall be measured by the loss resulting to him from the appropriation. If, as the court below found, the flooding and taking of a part of the plaintiff's farm has depreciated the usefulness and value of the remainder, owner is not justly compensated by paying for only that actually appropriated, and leaving him uncompensated for the depreciation over benefits to that which remains. In recognition of this principle of justice it is required that regard be had to the effect of the appropriation of a part of a single parcel upon the remaining interest of the owner, by taking into account both the benefits which accrue and the depreciation which results to the remainder in its use and value. Thus, in Bauman v. Ross, 167 U.S. 548, 574, 17 S.Ct. 966, 967, 42 L. Ed. 270, 283, it is said: 'Consequently, when part only of a parcel of land is taken for a highway, the value of that part is not the sole measure of compensation or damages to be paid to the owner; but the in-

cidental injury or benefit to the part not taken is also to be considered. When the part not taken is left in such shape or condition as to be in itself of less value than before, the owner is entitled to additional damages on that account. When, on the other hand, the part which he retains is specially and directly increased in value by the public improvement, the damages to the whole parcel by the appropriation of part of it are lessened.' "

See also, United States v. Welch, 217 U.S. 333, 30 S.Ct. 527, 54 L.Ed. 787, 28 L.R.A.,N.S., 385, 19 Ann.Cas. 680; Campbell v. United States, 266 U.S. 368, 45 S.Ct. 115, 69 L.Ed. 328; United States v. General Motors Corp., 323 U.S. 373, 65 S.Ct. 357, 156 A.L.R. 390; Lewis on Eminent Domain, 3d Ed., §§ 686 and 710.

A more recent application of the rule is found in cases in which losses to the property of the Chicago, B. & Q. Railroad Company were occasioned by improvements in the navigation of the Mississippi River. In United States v. Chicago, B. & Q. R. Co., 8 Cir., 82 F.2d 131, 106 A.L.R. 942, certiorari denied 298 U.S. 689, 56 S.Ct. 957, 80 L.Ed. 1408, it was shown that the level of the river was raised by a government dam to such a height as to flood twenty-four acres of the railroad's property and to cover the right of way and railroad embankment to a point 3.45 feet below the top of the railroad ties. Hence it became necessary to raise and widen the embankment and to raise the tracks so as to create a freeboard of seven feet above the new level of the pool and also to raise culverts and bridges and riprapp the embankment with rock. This work was necessary in order that the railroad might have as good and safe a track as it had before the improvement and to secure protection against the effect of saturation, wave action and distortion by ice. The suit was brought by the United States for condemnation of the floodway easement over the right of way and railroad embankment, and it was held that the railroad was entitled to recover not only the value of the twenty-four acres permanently submerged, which was comparatively small, but also the cost for the changes in the embankment and the railroad line which were needed to protect the railroad and enable it to continue in operation. A verdict in favor of the railroad for $240,000 was sustained. This decision was followed by

United States v. Chicago, B. & Q. R. Co., 7 Cir., 90 F.2d 161, in which the railroad was allowed the sum of $400 for 1.6 acre submerged and the additional sum of $347,411.65 as just compensation for the damage to the remainder of the railroad's property caused by the construction and operation of the dam.

■ We think that this rule is applicable here and that in each case the landowner should be compensated for the loss to the residue of his property occasioned by the building of the dam. The District Judge, as we have seen, based the amount of the recovery in each case upon the reasonable cost, as of September 22, 1938, of protective work adequate to prevent the damage by erosion if installed prior to the raising of the level of the river. He found that the cost of such work in the Dickinson case would have been $4,245.63 and in the Withrow case $1,859.40 and that in each instance it would have been sound economy, in view of the character and nature of the property, to have made the expenditure.

■ The United States argues that there was no showing as to whether or not these sums exceeded the damages from erosion and therefore should not have been allowed because the government is not liable for any sum greater than the market value of the property that might otherwise be destroyed. The testimony, however, shows that Dickinson's property was worth $45,000 and Withrow's property $15,000 in September, 1938, and qualified witnesses testified that in view of the character and value of the property, the expenditure of larger sums than those allowed by the court to prevent erosion and damages would have been economically justified. This evidence can only mean that the erosion unchecked would destroy property values equal to or in excess of the cost of preventive structures. The issue involved is one of fact, and there was evidence to support the finding of the judge. There was abundant evidence given at the hearing to show that erosion had resulted and would result from the operation of the dam; and it was the function of the trial court to determine the amount of the resultant damage. We find no reason to upset its findings in these respects.

■ The United States also contends that Dickinson is not entitled to compensa-

tion for the permanent flooding of the entire 0.22 acre submerged, because in the year 1940, with the permission of the Secretary of War, he reclaimed the greater part thereof. This was done at a cost of $16,000 by the installation of protective work consisting of earth and rock fill to prevent further erosion and damage. The fill exceeded the amount of the river bank that had been washed into the river, with the result that all but 0.05 acre of the land originally submerged was reclaimed. It is therefore contended that Dickinson is entitled to be compensated only for the 0.05 acre, and the decision in Kelley's Creek & N. R. Co. v. United States, 100 Ct.Cl. 396, 412, is cited in support of the contention. We disagree with the holding in that case insofar as it may be thought to lead to the conclusion that Dickinson was not entitled to be paid for the value of the entire acreage completely taken on September 26, 1938. At that time the land was taken under an implied contract on the part of the United States to pay for it. It is clear that the government was not relieved from this obligation by the mere fact that the landowner, with its approval, subsequently recovered a part of the acreage at his own expense.

[redacted] Finally, the government contends that there was no evidence to support the finding that the government took an easement to flood the land intermittently or to support the value placed upon the easement by the court. In neither aspect can the contention be sustained. The easement relates to the land between the permanent elevation of the pool at 566 feet and elevation 574 feet above sea level covering 0.10 acre of Dickinson's land for which $75 was allowed and 0.04 acre of Withrow's land, for which $35 was allowed. Qualified witnesses estimated the diminution of value that would occur upon the assumption that the acreage would be flooded from time to time and these estimates were in excess of the allowances made by the court. There was in addition evidence to support the finding that the acreage would be subject to intermittent flooding by the operation of the dam. It was shown that the government had acquired by condemnation flowage easements extending to the elevation of 574 feet on non-navigable streams contributory to the Winfield Pool in the vicinity of the Dickinson and Withrow properties and that within the eight foot area between the elevations of 566 and 574 feet the stage of the river can be made to rise and fall through the manipulation of the dam. The frequency within which the flooding will occur was not shown, but we think that the acquisition of flowage easements in the vicinity and the construction of the dam with equipment capable of flooding the lands to the elevation of 574 feet indicate an intent to subject the land to intermittent flooding and amount to the taking of easements for which compensation was due. See Peabody v. United States, 231 U.S. 530, 34 S.Ct. 159, 58 L.Ed. 351.

The judgments of the District Court will be

Affirmed.