J. R. KREGAR et al. v. KATIE FOGARTY et al.

No. 15,642.    (96 Pac. 845.)

SYLLABUS BY THE COURT.

1. NAVIGABLE RIVERS — Evidence. The fact that a government surveyor meandered the banks of a river is evidence that the river was navigable, but is not conclusive of that fact.

2. ——— Same. Chapter 97 of the Laws of 1864, declaring the Smoky Hill and other rivers not navigable, does not conclusively establish the fact that they were navigable before, although affording an implication that they had been theretofore so considered.

3. ——— Same. Both upon the evidence in this case and as a matter of judicial knowledge the finding of the district court that the Smoky Hill river was not navigable is affirmed.

4. TITLE AND OWNERSHIP—Mill-dam Site—Evidence. The finding of the district court that the defendants' ancestor owned the land on the banks of the river where he erected the dam in 1874 is sustained by the evidence reviewed in the opinion.

5. WATERS AND WATERCOURSES—Mill-dam—Abandonment—Forfeiture. The conclusions of the district court that the defendants' mill-dam had been only partially destroyed, and that

reasonable efforts were made to rebuild the same, the mill being intact, were supported by the findings; and the forfeiture provided by section 16 of the mill-dam act (Gen. Stat. 1901, § 4108) if the owner, "in case the said dam and mills connected therewith shall be destroyed, shall not begin to rebuild it one year after such destruction, and finish it in three years," did not take effect.

Error from Geary district court; OSCAR L. MOORE, judge. Opinion filed July 3, 1908. Affirmed.

*Thomas Dever,* for plaintiffs in error.

*James V. Humphrey,* for defendants in error.

The opinion of the court was delivered by

BENSON, J.: In the year 1874 Cornelius Fogarty erected a mill-dam in the Smoky Hill river, on a part of the former Fort Riley military reservation. Proceedings were taken under the mill-dam act. No objection is made to the regularity of the proceedings, except that it is claimed that Mr. Fogarty did not own the land upon which the dam was built, and that the act did not apply to that part of the river where it was located. The plaintiffs are the owners of land along the river, above the dam, affected by the overflow caused by such dam. The defendants are the heirs of Mr. Fogarty, and devisees, executors and trustees under his will. The plaintiffs deny that any right was acquired to build or maintain the dam, because the stream was navigable, and because Fogarty's land did not extend to the bank at one end of the dam. They also allege that if such right was ever obtained it was lost by the destruction of the dam and the failure to rebuild it in one year. They prayed for an injunction to prevent the rebuilding of the dam, which was refused. The defendants claim that plaintiffs are estopped by the proceedings under the mill-dam act against their predecessors in title, and by the operation of the fifteen-year statute of limitations. Defendants also plead a

former adjudication against one of the plaintiffs, and a release by the grantor of two others.

The principal questions discussed are whether the defendants' ancestor had the right to institute the proceedings under the act, and the effect of the destruction or partial destruction of the dam·upon the legal rights of the parties. The court made very complete findings, and as the abstract contains but little of the testimony the findings must be held to state the facts, unless in some of the particulars specified in the briefs they are in conflict with, or unsupported by, the evidence so presented in the abstract.

The claim that Fogarty acquired no rights through proceedings under the mill-dam act rests upon certain propositions affirmed by the plaintiffs, viz., that the river is navigable, and that the act has no application to a navigable stream; that Fogarty did not own the land upon which a part of the dam was erected, and that only such owner could acquire the right. The claim that the river is navigable is a deduction from the fact that in making the government survey of the adjacent lands the banks were meandered. This, it is insisted, is conclusive of the legal status of the river as a navigable stream, in the sense that the title of riparian owners extends only to the bank, and such appears to have been the view taken in *Park Commissioners v. Taylor*, 133 Iowa, 453, 108 N. W. 927. That decision was based upon an act of congress requiring surveys to be made in townships of six miles square by running north-and-south and east-and-west lines, unless "the course of navigable rivers may render this impracticable" (U. S. Rev. Stat. 1878, § 2395), and the directions given to surveyors that "both banks of navigable rivers are to be meandered." (Lester, Land Laws, Reg. & Decs. 714.) Another section of the statute declares "that all navigable rivers, within the territory to be disposed of by virtue of this act, shall be deemed to be and remain public highways." (1 U. S. Stat. at

L. p. 468.)  Section 5251 of the Revised Statutes of the United States of 1878 provides that "all the navigable rivers and waters in the former territories of Orleans and Louisiana shall be and forever remain public highways."

The argument deduced from these provisions is that when a survey of lands bordering on a river is duly made and approved, showing that such stream was meandered as provided by these statutes and the regulations of the general land-office, such stream is thenceforth considered navigable, as matter of law, whether navigable in fact or not; and, being so navigable, the title to the bed of the river is in the state. As this conclusion rests upon the interpretation of a federal statute, we may properly look to the federal decisions for authority. This matter was considered in a recent case in the circuit court of appeals involving title to the bed of Little River, in Arkansas. The plaintiffs were the owners of land adjacent to and abutting upon the meander-line of the river, as shown in the government survey, and by virtue of such ownership claimed title to the thread of the stream, upon the ground that it was not navigable, and sought to enjoin the defendants from hunting and fishing thereon. The defendants claimed that the river was navigable, its status having been fixed by the survey. Some evidence was also given to show that it was navigable in fact. In the course of the opinion Judge Hook said:

"To meet the test of navigability as understood in the American law a watercourse should be susceptible of use for purposes of commerce or possess a capacity for valuable floatage in the transportation to market of the products of the country through which it runs. It should be of practical usefulness to the public as a public highway in its natural state, and without the aid of artificial means. A theoretical or potential navigability, or one that is temporary, precarious, and unprofitable, is not sufficient. . . . To be navigable a watercourse must have a useful capacity as a public highway of transportation. . . . It does not follow

that, because a stream or body of water was once navigable, it has since continued and remains so. Changes may occur, especially in small and unimportant waters, from natural causes, such as the gradual attrition of the banks and the filling up of the bed with deposits of the soil, the abandonment of use followed by the encroachment of vegetation, and the selection by the water of other and more natural and convenient channels of escape, that work a destruction of capacity and utility as a means of transportation; and, when this result may fairly be said to be permanent, a stream or lake in such condition should cease to be classed among those waters that are charged with a public use.

"The action of the government surveyors in meandering a body of water or in surveying its bed is to be considered as evidence upon the question of its navigability or unnavigability at the time; but it is not conclusive. The surveyors are invested with no power to foreclose inquiry into the true character of the water. If the United States has disposed of lands bordering upon a meandered unnavigable watercourse or lake, by a patent containing no reservations, and there is nothing else indicating an intention to withhold title to the lands within the meander-lines (*Niles v. Cedar Point Club,* 175 U. S. 300, 20 Sup. Ct. 124, 44 L. Ed. 171), it has nothing left to convey; and whether the title to the bed of the waters is in the state or passes to the grantee in the patent is determined by the local law. (*Lamprey v. Minnesota,* 52 Minn. 181, 53 N. W. 1139, 18 L. R. A. 670, 38 Am. St. Rep. 541.)" (*Harrison et al. v. Fite et al.,* 148 Fed. 781, 783, 784, 78 C. C. A. 447.)

In disposing of public land bordering upon rivers it is not the policy of the government to reserve title to the lands under water, whether the stream be navigable or not. The government parts with its whole title, leaving the question of boundary, whether the shoreline or the thread of the stream, to be determined by the local law. In case of navigable waters in this state the boundary is at the bank, and the title to the bed of the stream is in the state. (*Wood v. Fowler,* 26 Kan. 682, 40 Am. Rep. 330.) The supreme court of the

35—78 KAN.

United States, in an exhaustive examination of this subject, said:

"If the boundary of the land granted had been a fresh-water river, there can be no doubt that the effect of the grant would have been such as is given to such grants by the law of the state, extending either to the margin or center of the stream, according to the rules of that law. It has been the practice of the government from its origin, in disposing of the public lands, to measure the price to be paid for them by the quantity of upland granted, no charge being made for the lands under the bed of the stream or other body of water. The meander-lines run along or near the margin of such waters are run for the purpose of ascertaining the exact quantity of the upland to be charged for, and not for the purpose of limiting the title of the grantee to such meander-lines. It has frequently been held, both by the federal and state courts, that such meander-lines are intended for the purpose of bounding and abutting the lands granted upon the waters whose margins are thus meandered; and that the waters themselves constitute the real boundary." (*Hardin v. Jordan,* 140 U. S. 371, 380, 11 Sup. Ct. 808, 838, 35 L. Ed. 428.)

The reason for following the sinuosities of the river bank in making the survey is to ascertain the quantity of land to be paid for, and not to determine the navigability of the stream, although, being done by public authority, such meandering affords some evidence of the fact of navigability. (*Wood v. Fowler,* 26 Kan. 682, 40 Am. Rep. 330.)

In *Toledo Liberal Shooting Co. v. Erie Shooting Club,* 90 Fed. 680, 33 C. C. A. 233, the contention was that a certain shallow, known as "Maumee Bay," was a navigable body of water. It had been surveyed and patented as swamp-land. The court said:

"The fact that this so-called 'bay' was surveyed and platted as swamp-land by the government affords a strong presumption against the navigability of the water thereon." (Page 681.)

The court thus gives to the survey the effect of a

presumption only. To give to the hastily formed opin-ion of a surveyor, who in the course of his arduous work, often in the wilderness, encounters a stream he may have never seen before, the effect of an adjudica-tion concluding for all time the question of its naviga-bility, as respects the rights of riparian owners, is a proposition to which we can not assent. Both upon the evidence and as a matter of judicial knowledge the conclusion of the district court that the river is not navigable must be affirmed. There is no legal fiction that a stream not navigable in fact is still to be held navigable as a matter of law. There is no such un-seemly conflict between fact and law.

Chapter 97 of the Laws of 1864, declaring the Smoky Hill and other rivers not navigable, does not conclu-sively establish the fact that they were navigable be-fore, although affording an implication that they had theretofore been so considered. The purpose of that act was to sanction the building of bridges and dams across them. (*Wood v. Fowler*, 26 Kan. 682, 40 Am. Rep. 330.)

The claim that the defendants' ancestor did not own the land upon which a part of the dam was built rests upon the following facts: A preliminary survey of the Fort Riley military reserve was made in 1855. No record of such survey was preserved. In 1857 a re-survey was made by one Stack, a deputy United States surveyor, who undertook to follow the lines of the first survey. Copies of the last survey, together with the field-notes and plats of all the surveys of public lands in Davis (Geary) county, were certified to the county surveyor, and are public records. (Gen. Stat. 1901, § 1810.) The notes of Stack's survey indicate a begin-ning at a corner of the reserve on the Republican river, thence southwardly to a point on the left bank of the Smoky Hill river. This is station 4, and is identified. Thence the river flows easterly, and then nearly north, to station 14, on the left bank, which is marked; thence

the course is across the river to station 15, on the right bank, which is also identified. From this station the course is along the right bank of the river. The monuments intervening between stations 4 and 14, a distance of over a mile, are lost. The dam is between these stations. The oral testimony is that, commencing at station 4 and protracting forward this line by the notes, it is twenty-five feet from the bank of the river at the west end of the dam, opposite the Fogarty mill. The surveyor who testified to this location of the line from the field-notes on cross-examination said:

"He [the government surveyor] was laying out the reservation, and I think that he intended to keep on the west bank of the river; that is what I think was his intention—to keep on the west bank of the river; but there is a mistake in his notes, and, if you follow his notes, as a matter of fact it does n't follow the bank of the river."

The defendants derive title from the government, under a patent to the Republican River Bridge Company conveying that portion of the Fort Riley military reserve lying between the Republican and Smoky Hill rivers and containing a reference to a plat thereof, upon which certain special sections are designated by numbers; among them is special section 9, in which the defendants' lands are included. The plat in evidence shows special section 9 extending to the Smoky Hill river. Upon this evidence, and proof of possession and use as a mill-dam site since 1874, the court found that the defendants' ancestor owned the land in question when the dam was built. The discrepancy in the notes can not overcome the evidence afforded by the plat, the recitals of the patent, and the strong probability that the river was intended to be the boundary. It can not be supposed that the government intended to leave an insignificant, narrow strip of land between the reserve line and the river, nearly a mile long, and extending at each end to a mere point. It is quite significant that

the only monuments remaining are upon the margin of the stream.

There is no question of defendants' title to the lands on the other side of the river. Under the common law of this state the title of a riparian owner upon unnavigable waters extends to the thread of the stream, and so Mr. Fogarty, when he built the dam, was the owner of all the land upon which it was erected, and had the right to proceed as he did under the mill-dam act to obtain the authority to erect and maintain the dam. (Gen. Stat. 1901, §§ 4093-4108.)

The remaining question is whether the rights acquired by proceedings under the mill-dam act were forfeited. The act provides:

"Any person having obtained the right to erect and maintain, or to maintain or raise any dam, under the provisions of this act, who shall not within one year thereafter begin to build said dam and finish the same, or who, having already erected said dam, shall for the same length of time fail to proceed under the provisions of this act to perfect his right to maintain the same, and apply the water-power thereby created to the purposes stated in his petition, within three years, or, in case the said dam and mills connected therewith shall be destroyed, shall not begin to rebuild it one year after such destruction, and finish it in three years, or, having erected such mills, shall fail to keep them in operation for two years at any one time, shall forfeit all rights acquired by virtue of the provisions of this act." (Gen. Stat. 1901, § 4108.)

The plaintiffs claim that all rights of the defendants to maintain this dam had ceased before this suit was begun, because of the destruction of the dam by flood in June, 1905. The finding of the court, however, is that the destruction of the dam was only partial (the mill remained intact), and that the work of repair and restoration was begun within a few days thereafter, which, being stopped by another freshet, was resumed, and although temporarily interrupted at different times was being carried on when this suit was com-

menced. These conclusions are supported by facts recited in the findings which are conceded to be true, but we are asked to say from photographic views of the river and ruins of the dam that the destruction was so complete, and the abandonment so long continued, that the forfeiture provided by the statute took effect. This would not only be contrary to the findings of the district court, but contrary to our own conclusions from the evidence. From the completion of the mill, soon after the dam was built, with the exception of the period of cessation caused by the partial destruction of the dam, Fogarty and his heirs and devisees have operated an extensive business by means of the power created by such dam. Large sums were expended by them in making repairs made necessary by breaches from freshets, and in maintaining the dam and power. No steps were taken in all this long period to question their rights or interfere with their enjoyment of the privileges presumptively acquired by the condemnation proceedings. Without discussing the question of limitations suggested by the defendants, it is proper to say that equity will scrutinize very carefully claims asserted at so late a day, and will not give relief by injunction in such a case unless the right thereto is entirely clear. The plaintiffs appear to concede the force of this suggestion when they say in their brief:

"If nature and her forces had not intervened and abated the original nuisance—abated the dam which Fogarty built—plaintiffs would not be here trying to prevent the creation of another nuisance or the building of another dam."

Some minor matters are discussed in the briefs, but the views we have taken of the controlling issues make their consideration unnecessary. The judgment is affirmed.