**IOWA–WISCONSIN BRIDGE CO. et al.
v. UNITED STATES.**

No. 46079.

United States Court of Claims.
July 11, 1949.

WHITAKER, J., dissenting.

———◆———

Fred A. Ontjes, Mason City, Iowa (Wm. C. Green, St. Paul, Minn., on the brief), for plaintiff.

Marvin J. Sonosky, Washington, D. C., and A. Devitt Vanech, Asst: Atty. Gen., for the defendant.

Before JONES, Chief Judge, and LITTLETON, WHITAKER, MADDEN and HOWELL, Judge.

HOWELL, Judge.

The plaintiff sues to recover just compensation for the alleged taking of its property by reason of the construction by the Government of Lock and Dam No. 9 in the Mississippi River 15.5 miles downstream from plaintiff's property.

In 1928 Congress authorized[1] the corporate predecessor of the plaintiff (sometimes hereinafter called the Bridge Company) to construct, maintain and operate a bridge and approaches thereto across the Mississippi River at or near Lansing, Iowa, to a point opposite in the State of Wisconsin. In 1930 and 1931 the Bridge Company secured the necessary approval of the War Department of its plans and specifications for the steel bridge across the Mississippi River and for the construction of the approach on the Wisconsin side of the river consisting of wooden pile bridges over Big, Indian, Stevens, Henderson and Winneshiek sloughs. The project was completed and opened to traffic in June 1931.

---

[1] Act of March 10, 1928, c. 170, 45 Stat. 280, as supplemented by the Act of February 28, 1931, c. 337, 46 Stat. 1457. This authorization was subject to the provisions of the Act of March 23, 1906, c. 1130, 34 Stat. 84, 33 U.S.C.A. § 491, et seq., requiring that the plans, specifications and location of the bridge and accessory works be approved by the Secretary of War and the Chief of Engineers.

At the site of the steel bridge, the Mississippi River is approximately 1,200 feet wide from bank to bank, and the bridge is approximately 1,600 feet long. Between the east bank of the Mississippi River and a point opposite near DeSoto, Wisconsin, there is an expanse of valley or bottom land cut by various sloughs, including the ones mentioned above.

The Bridge Company's project consists of an approach leading eastward from the town of Lansing, Iowa, to the Mississippi River, a high steel fixed span across the Mississippi River, and a roadway or dike leading eastward from the east end of the steel bridge on the Wisconsin side. The roadway and approach on the Wisconsin side extends easterly for about 2½ miles from the east bank of the Mississippi River to a point near DeSoto, Wisconsin, and consists of a road on a raised earthen embankment or dike, with wooden bridges traversing the several sloughs. The sloughs as approached from the Mississippi River, and the lengths of the wooden bridges traversing the sloughs, are: Big Slough, 288-foot bridge; Indian Slough, 20-foot bridge; Stevens Slough, 15-foot bridge; Henderson Slough, 30-foot bridge; Winneshiek Slough, 432-foot bridge including its extension over the Burlington Railroad right-of-way. Winneshiek Slough itself was 250 feet wide and Big Slough 148 feet wide at the time the bridges were constructed. On October 3, 1942, the Secretary of War and the Chief of Engineers approved the Bridge Company's plans for the replacement of the timber bridges across Stevens and Indian sloughs with solid fills and in 1944 Stevens Slough was filled in where it intersects the dike roadway.

Plaintiff's right-of-way on the Wisconsin side of the Mississippi River is 200 feet wide except for approximately ¼ mile at the eastern end where it is 300 feet wide. Prior to the construction of the dike, the elevation of the land within the right-of-way was approximately 620 feet above mean sea level. Ordinary high-water stage at the site of the Bridge Company's project was 616.5 feet and the height of the dike was approximately elevation 629 feet, leaving a vertical spread of 12½ feet at times of ordinary high water. As built, the dike was approximately 80 feet wide at the base and about 30 feet wide at the top. In many places the shoulders have now broken back to 25 or 26 feet.

In constructing the dike, the Bridge Company first cleared the trees and vegetation from all but the extreme fringes of the right-of-way. Working from the center of the right-of-way, earth was scooped up from each side to build the embankment, leaving borrow pits on each side for the entire length of the roadway. The pits were from 4 to 6 feet deep but were not of uniform width. Along about 60 percent of the length of the dike the borrow pits extended to the boundary of the right-of-way on each side of the dike. Along the remainder of the dike, berms of natural ground were left between the outside of the borrow pits and the boundary of the right-of-way, such berms varying in width from 15 to 25 feet. A berm of natural ground 4 to 5 feet wide was also left between the toe of the dike and the borrow pits. As the roadway or embankment approached the several sloughs, no earth was scooped up from the natural ground along the side of the dike for a distance of from 10 to 30 feet from the bank of each slough. Such natural ground barriers were substantially larger on each side of the dike adjacent to the west bank of Winneshiek Slough. On each side of the embankment, narrow pieces of ground were left undisturbed in the borrow pits at intervals for the purpose of obstructing the longitudinal flow of water in the borrow pits. Two small embankments for driveways leading to small farms near Winneshiek Slough served a similar purpose. The dike was surfaced with bluff-run material and used as a road.

When the dike was built, ordinary low-water stage at the site of the project was 611.91. The bottom of the borrow pits along both sides of the dike ranged in elevation from 614 to 616 feet so that little or no water stood in the pits except at times when the water approached ordinary high of 616.5 and in times of flood.

Lock and Dam No. 9 is one of a series of navigation dams constructed in the Mississippi River in order to create a nine-

foot channel between the mouth of the Illinois and the Twin City Dam, as provided by the Act of July 3, 1930, c. 847, 46 Stat. 918, 927. It is located 15.5 miles downstream from the bridge property and consists of a lock and concrete dam with 13 gates in the Mississippi River and an earthen section 9,300 feet long extending from the west end of the dam to the west side of the valley. In closed position the maximum and crest elevation of the gates is 620 feet above sea level. The gates of the dam were lowered for the first time for the purpose of maintaining full pool on April 11, 1938, and full pool level was reached April 18, 1938. The dam is operated to maintain project pool elevation of 620 feet at Lansing, 15 miles north of the dam although when the dam is in operation the pool at Lansing often exceeds 620 feet from a few inches to as much as a foot. When the flow of the river is sufficient to maintain pool level of 620 at Lansing without the help of the dam, the gates are lifted clear of the water. The pool of the dam extends back about 30 miles to Lock and Dam No. 8 at Genoa, Wisconsin. The Bridge Company's property is located in the vicinity of Lansing, about midway in the pool of Dam No. 9.

In February, 1944, plaintiff filed its first petition in this case alleging that a servitude had been placed upon its dike and bridges for which it was entitled to just compensation. The project had been and was then being operated as a toll bridge by the Bridge Company or its receivers. On March 18, 1945, large volumes of ice came down Big and Winneshiek Sloughs which jammed and piled up against the trestles and bents of the wooden pile bridges and forced out several spans from each bridge which have not been replaced. Following the destruction of parts of the bridges, plaintiff amended its petition to include this circumstance.

### Claims Relating to the Dike

The land in plaintiff's right-of-way on which the dike was constructed was fast ground lying generally from two to five feet above ordinary high water mark of 616.5, averaging approximately 620 for the entire length. The bottoms of the borrow pits on either side of the dike were scooped out to elevation 616 in some instances and to 614 in others. Prior to the time the dam was placed in operation natural high water mark was at elevation 616.5 and when the water reached that elevation it would contact the sides of the dike. The water level would fluctuate and for a substantial portion of the year there was little or no water in the borrow pits. Vegetation grew in the pits and trees and bushes grew on either side of the embankment and on the berms. Within a year or two after the dike was constructed, it had settled and become firm, and until after the dam was placed in operation it remained in good condition with only the usual amount of maintenance by occasional riprapping and minor repairs to the road surface.

After the dam was put in operation the water level at the site of the dike never dropped below elevation 620. This resulted in the permanent presence of at least from 4 to 6 feet of water in the borrow pits. The entire dike became saturated to elevation 620 and, by capillary action, the earth in the dike became wet for at least 5 feet above that elevation. This condition of saturation and permanent wetting caused landsides and sloughing of the sides and slopes of the embankment and berms and a consequent breaking away of the shoulders of the roadway. There was also resulting damage to the surface of the roadway. Vegetation growing in the borrow pits was destroyed as well as any vegetation on the sides of the dike growing below elevation 620. As the bank sloughed off, trees on the side dropped down to the lower elevation and died for lack of fast ground for their roots. Wave wash in the pits caused erosion at elevation 620, cutting into the dike and washing soil away from the roots of trees at that level.

We have found that the maintenance of pool level 620 by the Government has made it necessary to place a quantity of rock on the slopes of plaintiff's roadway in order to stabilize them, to restore the shoulders of the road where they have sloughed off, and to raise the roadway a few inches.

Adequate protection of the slopes of the embankment will require the deposit of some 20,000 cubic yards of rock. The cost of the rock in place on April 18, 1938, the date project pool level was first reached, was $1.65 per cubic yard. The cost on the date of filing of the first petition, February 19, 1944, was $2.00 per cubic yard. Approximately 7,500 cubic yards of surface material will be required to repair the roadway and the cost per cubic yard of this material on the same dates, respectively, was $1.25 and $1.50.

█ The defendant contends that there was no appropriation or taking of plaintiff's dike or any interest in it within the meaning of the Fifth Amendment. As a first ground for its contention, defendant urges that an undetermined but substantial amount of the damage to the dike actually occurred prior to the permanent elevation of the water level to 620 by operation of the dam. We have examined the evidence carefully and have found that the dike was in good condition at the time the dam was built and that instances of sloughing and erosion prior to that time were negligible. Next, the defendant urges that while some of the present instances of sloughing and erosion undoubtedly resulted from the maintenance of elevation 620, a substantial amount was due to high flows *above* elevation 620 when the gates of the dam were lifted clear of the water and the river flowed substantially as in a state of nature, and that the record does not disclose how much of the sloughing was due to such higher elevations. The Government seems to take the position that it is not responsible for any damage to the dike occurring when the water was *above* elevation 620 because at such higher levels the gates were lifted and the dam was not actually in operation. We cannot agree with defendant's position. Prior to the maintenance of pool level 620, the seasonal periods of high water did little damage to the dike. Such high water eventually receded leaving the borrow pits nearly dry and the dike had an opportunity to recover from even the most serious floods. After the creation of the project pool, the water level at the dike was never permitted to fall below elevation 620 and

we have found that the dike became saturated to that point and wet by capillary action some 5 or more feet above 620. We have no reason to suppose that seasonal high water above 620 from April 18, 1938 to March 1945, would have caused any more damage than it did from 1931 to 1938. We can only conclude that the greatly increased damage during the latter period was caused by the maintenance of pool level 620.

█ Finally, defendant contends that plaintiff is not entitled to relief from damage to the dike because that damage was not sufficient to interfere with the usual operation of the bridge project. Here defendant seems to be arguing that plaintiff may only recover the value of land which has been actually expropriated with nothing for that part of the land which has been reduced in value or damaged by the taking of the other part. There is no question but that the fast land lying above ordinary high water mark 616.5 in plaintiff's right-of-way and dike has been taken by the maintenance of elevation 620, 3½ feet above ordinary high water. Because of that taking, land in the embankment above 620 was damaged by the resulting sloughing and erosion. The Circuit Court of Appeals for the Eighth Circuit said in United States v. Chicago, B. & Q. R. Co., 82 F. 2d 131, 135, 106 A.L.R. 942, certiorari denied 298 U.S. 689, 56 S.Ct. 957, 80 L.Ed. 1408, in commenting upon the old rule that no recovery could be had for lands damaged by the taking of some part of the land:

"But this rule was so obviously unjust that it has become outmoded and been discarded practically in all jurisdictions. We think the correct rule is laid down by the able author of Lewis, Eminent Domain (3d Ed.) §§ 686 and 710, as follows:

" 'When part is taken, just compensation includes damages to the remainder. * * * "The constitutional provision cannot be carried out, in its letter and spirit, by anything short of a just compensation for all the direct damages to the owner of the lot, confined to that lot, occasioned by the taking of his land. The

paramount law intends that such owner, so far as that lot is in question, shall be put in as good a condition, pecuniarily, by a just compensation, as he would have been in, if that lot of land had remained entire, as his own property. * * *"''

If the United States had instituted a condemnation suit for a flowage easement over the lands of plaintiff flooded by the dam, the damage to the embankment resulting from the taking of the submerged or saturated portion of the dike would have been included as an item for which compensation must be made. United States v. Dickinson, 331 U.S. 745, 67 S.Ct. 1382, 91 L.Ed. 1789. We find no merit in defendant's contention.

Taking into consideration the small amount of damage to the dike caused prior to the construction of the dam, we conclude that plaintiff is entitled to just compensation in the amount of $33,000 for the rock protection to the slopes of the dike, and to $9,375 for road surfacing material.

■ When the dike and bridges were constructed, natural land barriers some 25 feet long on both sides of the dike were left on each side of Big Slough and on the south side of the dike on the west side of Winneshiek Slough. These barriers had a top elevation of slightly under 620 feet and, at ordinary high water level of 616.5, no water flowed across them. These barriers served as a protection to the bridge abutments and, until the dam was placed in operation, they remained in good condition, only slightly damaged by erosion at flood stages of the river. After the dam was placed in operation, there barriers were constantly under water and were eventually washed out by the transverse flow caused by the operation of the dam. The bridge abutments require the protection of these barriers and in order to provide such protection it will be necessary to build up the barriers and construct training walls. The record does not reveal the exact cost as of April 18, 1938, of constructing such barriers and training walls but the evidence is sufficient to show that the cost will be substantial. From all the evidence we are convinced that fair and just compensation to enable plaintiff to meet the condition so created by the placing of the servitude on its property, would be $2,000 and plaintiff may recover that amount.

## Claim Relating to Submerged Right-of-Way

■ We have found (Finding No. 20) that because of the elevation of the water level to 620 in and adjacent to the dike, the surface of the roadway will have to be raised. This in turn necessitates the widening of the dike at its base and along the slopes. Maintenance of the pool level at elevation 620 has flooded the borrow pits up to that elevation and has rendered unavailable some 20,000 cubic yards of earth therein lying above ordinary high water mark of 616.5, that would have been available to the Bridge Company for use in the widening of the dike. We have also found that the fair and reasonable value of such submerged material in place for that purpose as of April 18, 1938, was 25 cents per cubic yard, making a total of $5,000. The defendant contends that, assuming the Bridge Company to own the right-of-way in fee (a matter which we discuss later in this opinion), plaintiff is entitled to no monetary recovery because no measurable, compensable interest was taken by submergence of part of the right-of-way. Defendant insists that the proper measure of compensation is the fair market value of the right-of-way or the market value of the real estate and points out that the record contains no evidence that (a) there was a market for the earth made unavailable, (b) that the right-of-way was available as a source of supply to the market, and (c) that the fair price of earth on the market was 25 cents per cubic yard. The 25 cents per cubic yard represents the additional amount the Bridge Company would have had to pay a contractor to haul the earth to the dike over what it would have cost the Bridge Company to have used earth in the right-of-way. This value, says defendant, represents the value of the earth to the owner of the property for a possible but not a necessary or intended use.

We have found that it was necessary to widen the dike and that, except for the elevation of the water level at the site of

the project, the earth in the right-of-way would have been available, for such purpose. In these circumstances, even according to the cases cited by defendant [2] we are taking into consideration, as we properly may, "the highest and most profitable use for which the property is adaptable and needed, or is likely to be needed in the near future" and we have not included "elements affecting value that depend upon events, which while possible are not fairly shown to be reasonably probable." [3] The event, i. e., the necessity for widening the dike, has already occurred. The property of the plaintiff which could and would have been used for that purpose has been taken, and the proper measure of compensation for the earth taken is its value for that use. Value based on the market price of the earth within the right-of-way merely as real estate and without reference to uses for which the property is suitable, would not be just compensation. Boom Co. v. Patterson, 98 U.S. 403, 25 L.Ed. 206. Just compensation for the taking of that land properly involves the payment of an amount which will cover the expense to plaintiff of obtaining the soil elsewhere than from his right-of-way. In re West Farms Road in City of New York, 47 Misc. 216, 95 N.Y.S. 894. Accordingly, we conclude that plaintiff is entitled to receive as just compensation for the taking of 20,000 cubic yards of earth in its right-of-way, the sum of $5,000.

Finally defendant contends that plaintiff may not, in any event, recover for the earth submerged and taken, because the United States and not the Bridge Company owns the major portion of the land in the right-of-way areas submerged at pool elevation. As a basis for this contention defendant argues that the phraseology of the conveyances to the United States spells out the reservation of an easement consisting merely of a right of passage over Government land and did not include the right to the earth itself.

Plaintiff's right-of-way includes some 59.86 acres of land and is about 2½ miles long. As to 14.30 acres (½ mile), the defendant concedes that the Bridge Company has the fee title. As to 45.41 acres, constituting a little less than 2 miles of the right-of-way, the following facts are pertinent.

Prior to 1928, the United States was desirous of acquiring certain lands in the Mississippi River Valley near Lansing, Iowa, for the Upper Mississippi River Wild Life and Fish Refuge. Prior to 1927, the owners of the land which the Government wished to acquire had promised the Bridge Company that they would grant to it whatever land was required for a right-of-way across their lands for the purposes of the dike and bridge project. Julius Boeckh, one of the organizers of the Bridge Company represented himself and other owners of the lands in negotiations with the Department of Agriculture in connection with the sale of the lands to the Government. Boeckh informed the Government representatives that the landowners had promised to convey a right-of-way to the Bridge Company and that a strip 200 feet wide would be needed from which to borrow sufficient earth to build the embankment of the roadway. The Government representative told Boeckh that since the building of the project would benefit the Wild Life and Fish Refuge, the owners could have a strip 200 feet wide or any greater amount they might need. The Government requested that the right-of-way be surveyed, staked out, marked on the ground, and a plat made. This was done and the plat so prepared was attached to each of the deeds conveying the land to the Government. In each of the deeds (except one which we discuss hereinafter) from the individual owners to the United States conveying land which included any part of the proposed right-of-way, the following language appears:

" * * * and also reserving unto the grantor across said lands a right-of-way

---

[2] Cameron Development Co. v. United States, 5 Cir., 145 F.2d 209, 210; United States v. Rayno, 1 Cir., 136 F.2d 376.

In these cases it was held that in condemning land the Government need not pay the value of materials in the land taken based on a use to which the owner never intended to put them and for which use the property was not adapted.

[3] Cameron Development Co. v. United States, supra.

for the purpose of the proposed new bridge across the Mississippi River, said right-of-way being more particularly described as to width, courses, and distances, in the map attached hereto which is hereby incorporated in and made a part of this deed."

At some later date, each of the individuals conveyed to the Bridge Company that portion of land each had reserved in the conveyance to the Government, describing the premises in detail and further stating:

"The intention being to hereby convey to Iowa-Wisconsin Bridge Company all of that certain right-of-way reserved by this grantor unto himself in that certain warranty deed executed and delivered by this grantor to the United States of America on * * *."

A map was attached to and made a part of each deed, which was a duplicate print of the pertinent part of the plot attached to the deeds to the United States. Thereafter, the Bridge Company cut the necessary trees from the right-of-way and constructed its dike from materials in the right-of-way as described earlier in this opinion, all with the knowledge and apparent approval of the Government. When the Government cut trees in connection with the lock and dam project, it did not cut any trees on the Bridge Company's right-of-way, nor has the Government at any time asserted any rights in the right-of-way or objected to anything the Bridge Company has seen fit to do with the land.

■ The Government concedes that the intention of the parties governs the construction of deeds by the court but points out that where there is no ambiguity in the language used, the intent must be arrived at from such language. Polebitzke v. John Week Lumber Co., 157 Wis. 377, 147 N.W. 703, Ann.Cas.1916B, 604. Defendant then tells us that the language employed in these deeds is unambiguous and creates merely an easement of way "wholly repugnant to the retention of fee title," first, because by their terms the deeds conveyed the full acreage excepting nothing; second, because each deed employs the words "reserving," "a right-of-way," and "across said lands," which words spell out only an

easement of way, and third, because the very use of the phrase "right-of-way" is conclusive of an intention to reserve an easement, not to retain ownership of the fee.

We think it is immaterial for the purposes of this case, whether the reservations in the deeds to the Government constituted an easement or whether the owners retained fee title to the property in the 200-foot wide strip of land. The important question is what rights did the owners retain in the land described in the reservation, for they could not convey to the Bridge Company more rights than they succeeded in retaining in themselves. The Government says that all the grantors reserved was the right of passage over the property and only those uses of the land which are consistent with the enjoyment of that right of passage. Such uses did not, urges the Government, include the right of possession; that while the Bridge Company could cut down the trees to make it possible for it to enjoy the right of passage, the trees cut belonged to the United States; that the Bridge Company had no right to excavate as it did, the huge quantities of the Government soil to construct its high dike embankment, and that such use imposed an unauthorized burden on the servient estate. From this, defendant concludes that the inundation by pool level 620 of the earth in plaintiff's right-of-way deprived plaintiff of no right for which it may be compensated.

■ We cannot agree that the use of the words "reserving" "right-of-way" and "across" in the deeds describe the intention which defendant ascribes to the parties. While the use of the word "excepting" might have indicated the retention of greater rights than the word "reserving," the two words are often used interchangeably, and any technical meaning must be derived from the intention of the parties. Jones v. Hoffman et al., 149 Wis. 30, 134 N.W. 1046. Restatement of Law, Property, § 473. It is certain that the parties intended the grantors to retain certain rights, powers, privileges, and immunities with regard to the area described in the so-called right-of-way. Whether the rights

retained were all the rights one can have in land and therefore made up a fee, as contended by plaintiff, or whether they were only certain of the usual bundle of rights making up complete ownership of land, is immaterial to the issue here as long as the rights, etc., retained included the right to use whatever earth was necessary in the right-of-way to build the embankment and to keep it in repair.[4] We think it is quite clear that this right was retained by the grantors and conveyed to the Bridge Company. The deeds to the Government state that the right of way is "for the purposes of the proposed new bridge across the Mississippi River." The bridge would have been of no use without the dike road. Because of the swampy nature of the vicinity, a high embankment was necessary to provide an adequate roadway. The negotiations leading up to the conveyances of the property also bear out our conclusion. The necessity for a right of way 200 feet in width was to provide the Bridge Company with sufficient earth which it might borrow to build an adequate embankment to support the road surface. The Government wanted the road and bridges built because of their benefit to the Wild Life and Fish Refuge and was willing to grant any amount needed for that purpose. At no time has the Government ever objected to plaintiff's use of the earth in the right-of-way, or, for that matter, to any of its uses. We accordingly conclude that, whatever the technical meaning of the words used in the deeds, the rights intended by both parties to be retained and which were retained, in the earth of the right-of-way, were sufficient to entitle the Bridge Company to use the earth in its right-of-way to build and keep its roadway in repair and accordingly it is entitled to be compensated for the taking of any part of that earth.

A part of the right-of-way consisting of 0.15 of an acre lying in Lot 4 conveyed to the Government by one Robert H. Kerndt, is the subject of still another controversy. With respect to this portion of the right-of-way, the Government contends that plaintiff does not even have an easement of way. The details of this matter are set forth at some length in our Finding No. 35 and, inasmuch as the Government in its brief expresses a willingness to have the court, for the purposes of this case, regard Lot 4 as subject to a right-of-way of the same tenor as the ones described in the other deeds, we shall not repeat that detail herein. However, since the defendant makes this concession on the assumption that the Government is not obligated to pay for the unknown quantity of earth on the 0.15 of an acre made unavailable at pool elevation, even if the plaintiff did acquire an easement as to that part of the property, we feel compelled to discuss the problem.

As shown by our Finding No. 35, Robert H. Kerndt was the owner of several tracts of land including the one in question, some of which were to be traversed by the proposed right-of-way, and some not. Some time prior to 1927 Kerndt entered into an option agreement with the United States agreeing to sell to the United States all his lands in the vicinity of the proposed right-of-way. The agreement contained a provision reserving a right-of-way for the bridge project, but the description of that lot and sections in the proposed right-of-way did not include the land now in controversy because at that time it was contemplated that the dike would take a course that would not traverse Lot 4. Later it was settled that the right-of-way would traverse Lot 4, and the plat or map attached to the various deeds, dealt with previously herein, shows that the right-of-way does traverse the northwestern corner of Lot 4. The deeds, at the instance of the United States, were drafted by an attorney in the office of the Solicitor of the Department of Agriculture, including the deed conveying Lot 4 to the Government. The negotiations between Boeckh, who acted for Kerndt as well as for the other owners, and the representatives of the Department of Agriculture, dealt with all the

---

[4] 38 Harvard Law Review, p. 180, "Exception and Reservation of Easements," by Harry A. Bigelow and J. W. Madden.

Kerndt lands in a single block. The attorney in the Department of Agriculture, Stanley Hall, was furnished with the plat showing the entire course of the right-of-way and knew that a portion of Lot 4 was to be included therein. By inadvertance, the deed conveying the property including Lot 4, did not contain the language of reservation although the other deed conveying the balance of Kerndt's land did contain such reservation with respect to the portion of the right-of-way lying in such land. It was understood by all that the 200-foot right-of-way was to be the subject of a reservation in any deed relating to any part of it. Relying on this understanding, and knowing that it was the intention of the Government as well as his intention to make the necessary reservations in the deeds, Kerndt signed the deeds prepared by the Government without examing them. Believing that he had reserved the 200-foot strip across Lot. 4, Kerndt gave to the Bridge Company his deed including in it the segment in Lot. 4, and warranted that he was lawfully seised of such premises. We have described elsewhere the work done by the Bridge Company in the right-of-way, and pointed out that the Government was at all times aware of this work and acquiesced in it.

Sometime in 1933, the Superintendent of the Upper Mississippi River Wild Life and Fish Refuge wrote to the Chief of the Bureau of Biological Survey in Washington, D. C., stating that it had recently come to light from an examination of a map, that the deed from Kerndt to the United States conveying Lot 4, had not reserved the necessary easement for the Bridge Company's right-of-way and that the suggestion had accordingly been made to the Bridge Company that it apply to the Secretary of Agriculture for an appropriate permit. The letter expressed the opinion that the omission was unquestionably due to an oversight, and recommended that a permit be issued. After further correspondence, Seth Thomas, Solicitor of the Department of Agriculture, wrote to the Chief of the Bureau of Biological Survey on March 21, 1934, stating that in his

opinion the reservation should have appeared in the deed to the United States conveying Lot 4 and that, in accepting the deeds as written, it was the understanding of the parties that the lands conveyed would be subject to the easement. He concluded that the proposed permit should not be issued but that the Superintendent of the Upper Mississippi Wild Life and Fish Refuge should write a letter to the Receiver of the Bridge Company informing him that since the reservation was inadvertently omitted from one of the two deeds of March 3, 1928, from Mr. Kerndt, a permit would not be necessary. On April 14, 1934, Ray C. Steele, Superintendent of the Upper Mississippi River Wild Life and Fish Refuge, wrote to Oscar R. Thorson, Receiver of the Bridge Company, advising him that the Department had decided that a permit would not be necessary inasmuch as it was the evident intention of both parties to include the lot in the reservation made in the Kerndt deed and that it was through an inadvertence that the lot was omitted. The letter closes with this statement: "It was, of course, realized all along that this was exactly what happened; however, it is gratifying that the Washington office has taken this position and as a consequence we can now close the matter on our records." No further question has ever been raised with respect to plaintiff's right to maintain its right-of-way over that part of Lot 4 until the defendant contested such right in its brief.

Defendant states that the judgment of the Court of Claims cannot be one of reformation. We do not quite know what defendant means by this statement. Our judgment, if for the plaintiff, will be for a sum of money representing just compensation. It seems to be well established that in a case where a party would have had the legal right to recover money damages from the United States under a written instrument except for the omission by mutual mistake of some essential element from that written instrument, and where it is clear that both parties intended such element to be included, this court has equitable jurisdiction to reform the instrument

so as to express the understanding and intentions of the parties, and for the purpose of determining whether the claim, if established, is a valid one against the United States, and having so determined, to award a money judgment. District of Columbia v. Barnes, 197 U.S. 146, 25 S.Ct. 401, 49 L.Ed. 699; Cramp & Sons Ship & Engine Bldg. Co. v. United States, 239 U. S. 221, 36 S.Ct. 70, 60 L.Ed. 238; United States v. Milliken Imprinting Co., 202 U. S. 168, 26 S.Ct. 572, 50 L.Ed. 980. In the instant case there was a mutual mistake in the omission of the reservation relative to the strip across Lot 4 in the deed, both parties having intended that such reservation be included. The mistake has been openly acknowledged and the parties have always acted with respect to the property in accordance with their original intention. For the purpose of holding that plaintiff is entitled to recover just compensation for the earth taken from that portion of the right-of-way, we conclude that plaintiff owns the same rights in this portion of the right-of-way as it does in the others previously considered and which were expressly reserved in the deeds covering them.

## Claim Relating to the Wooden Bridges

A part of the Bridge Company's property consisted of wooden trestle bridges across Winneshiek and Big Sloughs. The decks or floors of these bridges rested upon a series of pile bents, seven piles to the bent. Winneshiek Slough Bridge was 432 feet long and had 31 bents. Big Slough Bridge was 288 feet long and had 19 bents.

About March 16, 1945, as ice in the Mississippi River broke up and began to move downstream, large cakes lodged in front of and against the two bridges. From March 16 through March 19, the river rose from an elevation of approximately 620 to approximately 625, and on March 18 and 19, when the river was at elevations 625 to 625.5, the pressure of accumulated ice against the trestle work forced out a number of trestles from each bridge, carrying with them portions of the deck or floor.

In consequence, traffic over the bridge project was and still is prevented.

[11] The defendant contends that there was no taking of plaintiff's wooden bridges within the meaning of the Fifth Amendment and advances a number of reasons why this is so. The first reason advanced is that there was no causal relation between Dam No. 9 and the damage to the bridges (1) because the damage was actually caused by excessive ice conditions in 1945 from natural causes accompanied by unusually high stages of flow and (2) because at the time of the damage to the bridges, the river had risen above 620 and the river was not controlled by the dam. As to defendant's first argument, we have found (Finding No. 27) that the flood stage of the Mississippi River in March 1945 was not unusual nor was the year one of excessive ice from natural causes. Defendant's second argument seems to be that the Government is not responsible for any damage occurring when the river was above elevation 620 because at that level the water was flowing as in a state of nature, the gates of the lock and dam having been lifted. It seems to us that this contention completely ignores the fact that the continuous maintenance by the Government of a pool level of *no less than* 620 resulted in the placing of a permanent servitude on plaintiff's land and created a new and permanent condition of flooding on the land surrounding plaintiff's property wherever that land lay below elevation 620. The Mississippi River flows in a southerly direction past DeSoto and past the head of Winneshiek Slough and then southwest to the City of Lansing where it makes a sharp turn near the site of plaintiff's steel bridge. The river then bears to the southeast. These changes in direction form a large bend or bow in the river so that the distance through the two sloughs in question is shorter than the distance around the bend, the sloughs constituting short cuts across the bend in the river. Defendant's Exhibit 27, being a map of the area in question, has been reproduced in part, and is attached hereto and made a part hereof, as Appendix A.

Prior to the raising of the water level in the river, closing dams, constructed by the Government at some time prior to the building of the Bridge Company project, restricted the water of the Mississippi River at lower stages from entering the sloughs, although at high stages they had no effect on the amount of water or ice going into the sloughs since the top elevation of the dams was only a little above ordinary high water mark of 616.5. After the raising of the water level to 620 in 1938, water flowed over these closing dams throughout the year. Whereas prior to pool level 620 there was little water flowing through the sloughs except in times of high water, after the raising of the level to 620 much larger quantities of water flowed into the sloughs at increased velocities, subjecting the beds and banks of the sloughs to continuous scouring, and maintaining a water level of at least 620 elevation at all times. This scouring of the bed of the sloughs and raising of the water level in the sloughs reduced their natural capacity to carry off ordinary spring floods and ice conditions. The scouring of the beds around the bridge piers weakened and undermined such piers. The permanent flooding to level 620 of the land upstream from the bridges created a much greater surface of ice which the sloughs could not take care of.

From all this, we believe it follows that the damage resulting when the water level was above 620 and the gates of the dam were not in operation, was due primarily to the maintenance since 1938 of the new high water level of 620 by the Government. The raising of the water level above ordinary high water placed a servitude on plaintiff's property and created a permanent condition that was potentially dangerous in that prior to its existence plaintiff's bridge facilities were adequate to withstand the ravages of nature's yearly floods and ice jams, but after its creation and maintenance plaintiff's bridges became inadequate to resist even the normal flood conditions of 1945 superimposed upon this condition. To say that in flood times when the river reached elevations above 620 and the gates of the dam were lifted, the river was flowing in a state of nature, is, we think, begging the question. Prior to the maintenance of pool level 620, damage to plaintiff's bridges by flood stages above 620 was negligible. If, after the creation and maintenance of the 620 pool plaintiff's damage occurred during floods above that level, such damage is, we believe, a direct consequence of the maintenance of the 620 level which weakened the bridges.

Next, the defendant says that the Bridge Company was at fault in constructing bridges inadequate to withstand ice conditions reasonably to be anticipated under natural conditions. We find little merit in this contention. As set forth in Finding No. 26, the bridges had been kept in reasonably good repair by the driving of extra piling along both sides of Winneshiek Bridge and the placing of railroad irons on the north side of the bridge. Ice breakers had also been installed on the north side of the bridge. The bridges were kept in operating condition and were in continuous use from June 1931 to March 18-19, 1945, and when they went out they had withstood the battering of the huge ice cakes for three days. In constructing their bridges, the Bridge Company did not rely on the fact that the closing dams would restrict the amount of ice flowing from the river into the sloughs in flood time, as contended by the defendant, because these dams did not have any effect on the amount of ice entering the sloughs, as pointed out above. The bridges had been adequate to withstand the ice coming over the dams every spring prior to 1938, and with the repairs actually made from time to time would have continued adequate if the bridges had not been weakened, as described above, by the new pool level.

Finally, defendant contends that even if the creation of the pool of Dam No. 9 caused the damage to the bridges, the plaintiff is not entitled to compensation under the Fifth Amendment because the bridges were in and over navigable waters of the United States and must suffer without compensation the improvements of navigation. At this point, defendant advances what seems to us, after consider-

able research into the question, a rather novel theory of navigability. This theory is expressed in its brief as follows:

"The Mississippi River is and was a navigable river at the times and points in question. * * * The two sloughs traversed by the damaged bridges (Winneshiek Slough and Big Slough) are a part of the river. They actually carry a portion of the total flow. The sloughs lead off from the main channel of the river and return to the main channel * * *. The beds of the sloughs are below ordinary high water mark * * *. The bents or trestles of the bridges across the sloughs are in the bed of the river below ordinary high water mark. In short, the bridges are in and across navigable waters of the United States."

Defendant refers us to no authority whatsoever in support of this theory of navigability. The facts stated in the portion of defendant's brief just quoted are correct but we have been unable to find either in the cases or in texts on this subject an instance where these facts have resulted in the conclusion that such sloughs are navigable bodies of water. The rule in this country has been, and as far as we can tell, still is, that navigability is a fact which must be proved, and the proof must consist of evidence that the watercourse in question is either used or is susceptible of use, in its ordinary condition, as a highway of commerce over which trade and travel are or may be conducted in the customary modes of trade and travel on water. The Daniel Ball, 10 Wall. 557, 563, 19 L.Ed. 999. It is not the fact that the tide ebbs and flows in a stream, nor is it a matter of depth and width, uninterrupted course or free channel or year-round floatability, which alone, or in combination, make a stream a public highway. The stream must be accessible to the public as a means of carrying on the trade or commerce of the country surrounding. Thus, in logging communities, streams which are capable of

floating logs on their way to the mills have been held to be navigable waters although actual boating on them would, for the most part, have been impossible.[5] The same has been held true of shallow streams in agricultural communities where the streams have been habitually used to carry the produce of the country to market. In States where fishing and hunting are of importance, streams habitually used by the public for that purpose have been held public waters.

In all the above types of cases the courts constantly emphasize the principle that the servitude imposed upon the land bordering on such streams is for the benefit of the *public* in the interest of *commerce*. If no such benefit or interest is, or is likely to be, served by a watercourse, it is not a public watercourse of the United States. In no case that we have been able to find has a court held a stream to be a public water of the United States in the absence of such considerations. In Kregar v. Fogarty, 78 Kan. 541, 96 P. 845, 847, the court said "There is no legal fiction that a stream not navigable in fact is still to be held navigable as a matter of law. There is no such unseemly conflict between fact and law."

The plaintiff has referred us to numerous cases, and we have found others, in which sloughs, admittedly a part of navigable bodies of water have been held not navigable themselves [6] because they served no useful commercial service to the public. The same was held true of a borrow pit extending for several miles parallel to the Mississippi River and lying only from 10 to 100 feet from the River, with two entrances to the River from which it received all its water. At flood stage the river overflowed the land between the river and the pit and water to a depth of 7 feet or more was always in the pit. The pit was held to be nonnavigable because it was not used as a highway for commerce. "To hold that the borrow pit, under the admitted facts, is navigable water of the United

[5] Dawson v. McMillan, 34 Wash. 269, 75 P. 807.

[6] Leovy v. United States, 177 U.S. 621, 20 S.Ct. 797, 44 L.Ed. 914; North American Dredging Co. of Nevada v. Mintzer, 9 Cir., 245 F. 297; Dawson v. McMillan, 34 Wash. 269, 75 P. 807; Healy v. Joliet & Chicago Railroad Company, 116 U.S. 191, 6 S.Ct. 352, 29 L.Ed. 607, affirming 94 Ill. 416.

States would be to stretch the term to include every body of water, natural or artificial, which has any character or connection with a navigable stream through which a small boat can be pushed by oar or pole." United States v. Ross, D.C.1947, 74 F.Supp. 6, 8.

▉ The plaintiff points out, and rightly, that the burden of proving navigability is on the party asserting it. Harrison v. Fite, 8 Cir., 148 F. 781. This burden the defendant has made no effort to assume, relying rather on its legal theory which requires no proof of navigability in fact. That theory we believe to be without foundation in the law and we conclude that the two sloughs in question are not navigable watercourses of the United States. We do not reach this conclusion, however, on the basis of defendant's default of proof. The record contains sufficient facts to support this conclusion (Finding No. 13). Both sloughs start at openings in the Mississippi River above the Bridge Company's property, cross that property, divide into several branches and wind in many directions finally to reach the Mississippi downstream from the bridge property. On rare occasions a small row boat has been seen in the sloughs which contain no docks or landing places. The land through which they wind is not agricultural land and the country supports no industry. The sloughs have never served any useful commercial purpose or travel purpose; in fact there are no such purposes there to be served. In short, the record contains no facts from which we can conclude that these sloughs are navigable in fact but rather facts which point the other way.

On the question of damages, defendant contends that, assuming arguendo, liability in the Government, the plaintiff would at best be entitled to the market value of the bridges as of the date of taking if one had occurred. That market value, says defendant, must be measured by the cost of reproduction less depreciation since the nature of the improvement is such that no other criterion could establish market value. Defendant closes this argument by pointing out that there is no satisfactory evidence in the record of depreciation.

▉ The cost of reproduction or replacement less depreciation is not the only measure of just compensation in the case of a taking of private property for public use. Replacing the damaged bridges with new wooden bridges of the same kind would not enable the plaintiff to meet and overcome the servitude placed upon his bridges by the operation of the Government's dam project. The bridges were not demolished and much of what remains is still useful. What is necessary to place the bridges in a condition to meet the new conditions created by the Government, is the placing of one 100-foot steel through-bridge span, 24 feet wide, over Big Slough, with supporting piers, and one 100-foot and one 140-foot steel deck-bridge span, 24 feet wide, over Winneshiek Slough, with supporting piers. It seems to us that the fair and reasonable cost of the construction of such spans at fair market value as of April 18, 1938, for labor and materials thereof, is a proper measure of just compensation. Even if the bridges had not gone out, the actions of the Government have, as we have held, placed a servitude on the plaintiff's bridges which to that extent constituted a taking which in turn damaged the remainder of the property. Just compensation for the part actually taken would have to include compensation for the remainder which was rendered inadequate or damaged.[7] The plaintiff must be made whole, but it is conceded that the ordinary measure of loss (market value of the property) cannot be applied in this case. What is required to make plaintiff whole is the placing of the steel spans over the two bridges with the necessary supporting piers. The fair and reasonable cost of the construction of the spans and piers for both bridges at fair market value for labor and materials, was $45,306.40 at the time of the hearing of evidence in this

[7] United States v. Chicago, B. & Q. R. Co., 8 Cir., 90 F.2d 161; United States v. Chicago, B. & Q. R. Co., 8 Cir., 82 F.2d 131, 106 A.L.R. 942; United States v. Dickinson, 331 U.S. 745, 67 S.Ct. 1382, 91 L.Ed. 1789; United States v. Grizzard, 219 U.S. 180, 31 S.Ct. 162, 55 L.Ed. 165, 31 L.R.A.,N.S., 1135.

case, November 1945; it was $41,967.67 on February 19, 1944, the date the first petition was filed in this case; it was $36,-164.41 on April 18, 1938, the date the servitude was first placed on the property. To the cost of such labor and materials should be added 5% representing reasonable value of engineering services for designs, supervision, necessary surveys, checking of estimates and general engineering work connected with the construction. There was evidence in the record of replacement cost of the two bridges as of March 1945 and April 18, 1938, as set forth in Finding No. 28, but such costs were greater than the cost of repairing and strengthening the bridges with steel spans and supporting piers.

Making allowances for the fact that the rehabilitation of the bridges with steel spans and supporting piers would result in superior structures than the wooden bridges and would hold up longer,[8] and taking into consideration the extent to which plaintiff would have had to keep the existing bridges in good repair by reason of high water and ice conditions under normal circumstances without the influence of pool level, we conclude that $35,000.00 represents just compensation to plaintiff to enable it to meet and overcome the servitude placed upon its bridges by the operation of Lock and Dam No. 9 by the Government.

The sum of all the items of recovery shown above is $84,375.00 and plaintiff may have judgment for this amount and, as a part of just compensation, interest thereon at the rate of four percent per annum from April 18, 1938, to date of payment.

It is so ordered.

JONES, Chief Judge, and MADDEN and LITTLETON, Judges, concur.

WHITAKER, Judge (dissenting).

I cannot agree with the opinion of the majority. Its soundness depends in large part at least on the premise that the so-called sloughs over which the damaged bridges were built were nonnavigable. The majority finds that they were nonnavigable. If this finding is wrong, the conclusion that the Government is liable for the damage to these bridges is wrong. If these sloughs were navigable, then any damage done to the bridges erected over them as a result of an improvement of navigation is damnum absque injuria.[9]

The commissioner was of opinion that the sloughs were navigable and his findings were based on this premise. The majority takes the contrary view. I agree with the commissioner.

These so-called sloughs are in fact channels of the Mississippi River. At the point where these bridges were erected the Mississippi River runs between two high bluffs. The valley between these bluffs is about 2½ miles wide. The main channel of the river at and above De Soto, Wisconsin, runs on the east side of the valley. Just below De Soto it veers across the valley to the west side and continues on down the west side to Island No. 152, where it divides into Crooked Slough and Harper's Slough, the main body of the water apparently going down Crooked Slough and over to the east bank of the valley.

Winneshiek Slough, over which one of the bridges was erected, takes off from the

---

[8] With respect to the two bridges we have a situation similar to that where the Government condemns part of a person's property, thereby damaging the remainder. In determining what is just compensation to make plaintiff whole, we may consider the cost of reproducing the damaged property and the cost of rehabilitating such property. If it appears that the property may be rehabilitated according to some feasible and economical plan shown by the evidence, and that by such rehabilitation the damages can be minimized so that they will be less than they would be if the remaining portion of the property be considered as of no

value, the cost of such rehabilitation *less the value recovered by such reconstruction* will be just compensation to the plaintiff. The cost of such reconstruction should include the cost of features which will enable the rehabilitated structure to meet and overcome the servitude placed upon it. City of Chicago v. Callender, 396 Ill. 371, 71 N.E.2d 643. Cf. Baltimore Steam Packet Company v. United States, 81 F.Supp. 707, 112 Ct.Cl. 433, 446.

[9] We discussed at some length the cases so holding in Kelley's Creek & N. W. R. Co. et al. v. United States, 100 Ct.Cl. 396.

main channel of the river just below De Soto. It meanders down through the valley from the east side to the west side and back again, and finally rejoins the main channel of the river at the mouth of Crooked Slough. Winneshiek Slough is, roughly, 8 or 10 miles long. Big Slough takes off from the main channel of the river just above plaintiff's dike and returns to the main channel of the river about a mile and a half down the stream. The bridge over Winneshiek Slough was about 500 feet long; the bridge over Big Slough was about 280 feet long; the other bridges were shorter.

These are referred to in the record as sloughs, but they are in fact channels of the Mississippi River. There is the main channel, and the channel called Winneshiek Slough, the channel called Big Slough, and other channels. The water in each of these channels is the water of the Mississippi River. The sloughs take off from the main channel and return to it. They are parts of the river.

The Mississippi River at this point is a navigable stream. When we say that a stream is navigable we mean that it is navigable from bank to bank; not merely that portion of it over which boats pass. If a stream is navigable, it is navigable from bank to bank, in the sense of the clause of the Constitution giving Congress the power to regulate commerce.

If a structure is erected in the bed of the stream, whether it be erected in the deep portion or a shallow portion, it is erected there at the peril of him who erected it. If in improving navigation on the stream damage results to the structure erected in its bed, the owner is without redress against the Government. Gibson v. United States, 166 U.S. 269, 272, 17 S.Ct. 578, 41 L.Ed. 996; Scranton v. Wheeler, 179 U.S. 141, 163, 21 S.Ct. 48, 45 L.Ed. 126; Philadelphia Co. v. Stimson, 223 U.S. 605, 635, 638, 32 S.Ct. 340, 56 L.Ed. 570; Greenleaf-Johnson Lumber Co. v. Garrison, 237 U.S. 251, 259, 35 S.Ct. 551, 59 L.Ed. 939; United States v. Chandler-Dunbar Water Power Co., 229 U.S. 53, 62, 63, 33 S.Ct. 667, 57 L.Ed. 1063; State of New Jersey v. Sargent, 269 U.S. 328, 337, 46 S.Ct. 122, 70 L.Ed. 289; United States v. Chicago, Milwaukee, St. Paul & Pacific Railroad Co. et al., 312 U.S. 592, 313 U.S. 543, 61 S.Ct. 772, 85 L.Ed. 1064; Kelley's Creek and Northwestern Railroad Co. et al. v. United States, 100 Ct.Cl. 396, 407 et seq. And it makes no difference whether the structure is erected in the portion over which boats travel or whether it is erected in the shallow water along the shore.

This is true of necessity because it would be impossible for the Government to raise the level of the water in the channel of the stream over which boats pass without raising the level of the water in the shallow parts.

Many times in its course a river will come up against an obstruction and the water will divide. Some of it will go on one side of the obstruction and some go on the other side, forming an island. It often happens that the water on one side of the island is deeper than that on the other; the river can be navigated on one side, but not on the other. Nevertheless, both branches of the river are navigable in the constitutional sense. This is necessarily true because it would be impossible for the Government to improve navigation by raising the water level on one side without affecting the channel on the other side.

These so-called sloughs are but different channels of the same river, and if the level of the water in the main channel is raised, then the level of the water in the other channels is necessarily raised, unless steps are taken to prevent the water from flowing down them at all. If the Government is immune from liability for damage to a structure erected in the main channel it must necessarily follow on principle that it is immune from liability for damage to a structure erected over one of the other channels.

As a matter of fact, some time before plaintiff built its dike across this river bottom and the bridges across the sloughs and the main channel, the Government had erected "closing dams" by throwing in rock at the head of Winneshiek and Big Sloughs, and at the heads of the others, in order to divert as much water as possible down the main channel. These closing dams, as they were called, did not prevent some water

from flowing down the sloughs, and at times of high water the river flowed over the top of these closing dams and down the sloughs.

· When the Government erected Lock and Dam No. 9 it raised the level of the river above the tops of these closing dams. Thereafter the dams no longer served the purpose for which they were built and the water flowed down these sloughs unobstructed. The improvement of navigation in the main channel produced this result necessarily.

The Government had a right to improve navigation in the way it did, even though structures erected in the bed of any of the channels of the streams were damaged thereby. These structures were put there at the peril of the person putting them there.

If this view is correct, the Government is not liable· for the damage done to these bridges by the ice jams of which plaintiff complains.

The plaintiff also claims damages for erosion of its dike as a result of the raising of the level of the river. The commissioner found that a great deal of this erosion had taken place prior to the building of Lock and Dam No. 9, and that some of it had taken place after the raising of the level of the river, and he found that it was impossible to tell how much of it had taken place before and how much afterwards. The court says it can determine how much of the damage was done after the level of the river had been raised and it awards judgment therefor.

The testimony is conflicting on this issue. In such a case I do not think the finding of the commissioner should be set aside unless the preponderance of the testimony is clearly against the finding. The court has not seen the witnesses. The commissioner did see them. He observed their manner and demeanor; he took the testimony of many of them at the site; he was in much better position to weigh the conflicting evidence than are we who have not seen the witnesses, who have not· seen the site, but must depend alone on the written record. The commissioner may have been wrong in his findings, and the court may be right. I do not know which is right, but I feel quite reluctant to overturn the commissioner's finding, since he was in so much better position to weigh the testimony than are we.

I must respectfully dissent.